IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

TIMOTHY K. DOUGLASS;                    §          CIVIL ACTION NO. 3:12-cv-01760-B
SCOTT P. DOUGLASS;
SAMUEL K. DOUGLASS; and
MARK N. DOUGLASS.

                     Plaintiffs,

      v.

Persons:

MARY ADAMS BEAKLEY;
DAVID JANSON BEAKLEY;
JOEL WILLIAM BEAKLEY;
AMY JANISE BEAKLEY;

Entities:

BEAKLEY & ASSOCIATES, P.C.;
FLP MANAGEMENT, INC.;
FLP REAL ESTATE DEVELOPMENT, LTD.
MAMA MIA PIZZA KITCHEN, LTD.;
MMPK RESTAURANTS, INC.;
I-27 POWERSPORTS, INC.;
I-27 MARINE & RV, LTD.
RANCHLAND HILLS GOLF CLUB, INC.;
RHRE ENTERPRISES, INC.;
RHRE REAL ESTATE DEVELOPMENT, LTD.;
MANNA REAL ESTATE DEVELOPMENT, LTD.;
THERMAL FLUID TECHNOLOGIES, LTD.;
THERMAL TECHNOLOGIES, INC.;
TIERRA DE TEJAS DEVELOPMENT, LTD.;
LBC REAL ESTATE DEVELOPMENT, LTD.;
COMMERCE RESOURCE GROUP; and
DQ REAL ESTATE DEVELOPMENT, LTD.;

And

JOHN DOE DEFENDANTS 1-15.

## THE DOUGLASSES FIRST AMENDED COMPLAINT

Plaintiff Timothy K. Douglass, Scott P. Douglass, Samuel K. Douglass, and Mark N. Douglass ("Plaintiffs" or "Douglasses") hereby allege on personal knowledge as to their own respective activities and on information and belief as to the activities of others (realizing that the Defendants are ultimately and solely in possession of the documentation, awareness, and ultimate proof of the facts that underlie this dispute). Additionally, this is a very complex fact pattern, with an enormous number of entities, but this structure and complexity is not of Plaintiffs creation.

## IV.    THE PARTIES

### A.  Plaintiffs

1.      Plaintiff **Timothy K. Douglass** is an individual person residing in Brazos County, Texas.

2.      Plaintiff **Scott P. Douglass** is an individual person residing in Casablanca, Morocco.

3.      Plaintiff **Samuel K. Douglass** is an individual person residing in Rockwall County, Texas.

4.      Plaintiff **Mark N. Douglass** is an individual person residing in Brazos County, Texas.

5.      Plaintiffs will collectively be referred to as "**Plaintiffs**" or the "**Douglasses**" throughout.

### B.  The "Individual Defendants"

6.      The Douglasses are informed and believe that Defendant **Mary Adams Beakley** (maiden Mary Jan Adams, sometimes referred to as Mary Jan Beakley) is an individual person who may be found at 7004 Slide Rd., Lubbock, Texas

79424, 6102 Chicago Avenue, Lubbock, Texas 79424, and/or 2604 Texas Avenue, Lubbock, Texas 79411. She is the wife of former defendant John William Beakley. Defendant Mary Adams Beakley is an "overseer" of the various Defendant entities involved in this case. (See Exhibit D)

7.      The Douglasses are informed and believe that Defendant **Amy Janise Beakley** is an individual person, State Bar No. 24067331, residing at 4362 Childress Trail, Frisco, Texas 75034. Amy Janise Beakley is the daughter of former defendant John William Beakley. Defendant Amy Janise Beakley is represented by former defendant John William Beakley to perform "corporate work" for Roundtable Corporation. (See Exhibit D).

8.      The Douglasses are informed and believe that Defendant **Joel William Beakley** is an individual person residing at 423 Fairland Dr., Wylie, Texas 75098. Joel William Beakley is the son of former Defendant John William Beakley. Defendant Joel William Beakley is the "architect and is Director of Design & Development" of Roundtable Corporation. (See Exhibit D).

9.      The Douglasses are informed and believe that Defendant **David Janson Beakley** is an individual person residing at 4777 Cedar Springs Rd. Apt. 5J, Dallas, TX 75219. David Janson Beakley is the son of former Defendant John William Beakley. Defendant David Janson Beakley works "in the IT department and is also in charge of local store marketing and communications" for Roundtable Corporation.  (See Exhibit D).

C.  **The "Entity Defendants"**

*The Investing/Managing Defendants*

BEAKLEY & ASSOCIATES, P.C.;
FLP MANAGEMENT, INC.;

10.     The Douglasses are informed and believe that Defendant **Beakley & Associates, P.C.** is an entity with its principle place of business located at 7004 Slide Rd., Lubbock, Texas 79424, 6102 Chicago Avenue, Lubbock, Texas 79424, and/or 2604 Texas Avenue, Lubbock, Texas 79411. Its president, director, and registered agent is former Defendant John William Beakley. (See Exhibit O). Beakley & Associates, P.C. ("Beakley & Associates") is a Texas professional corporation whose stock is owned by former Defendant John W. Beakley. (See Receiver's Report, Dkt 150, page 5 of 23, such copy also attached hereto as Exhibit Q).   The entity operated a public accounting practice and investment advising service.   (See Receiver's Report, Dkt 150, page 5 of 23, see also www.beakleyassociates.com, excerpt attached as Exhibit P).   Its "Director of Operations" was Defendant Mary Jan Beakley. (See, e.g., Nov. 12, 2009 Email from Mary Beakley to Sam Douglass, attached as Exhibit R). Among the strengths touted by the firm, Investment Analysis is one (excerpt below, see Exhibit P, Beakley & Associates, P.C. Homepage):

INVESTMENT ANALYSIS

Today's investor can be easily confused by the wide variety of opportunities currently available. Not every "tax oriented investment" is a sound choice, and often, it is difficult to determine which options best meet your financial needs.

At BEAKLEY & ASSOCIATES, P.C., we strive to maximize your economic potential, while reducing the impact of tax liabilities. We maintain a relationship with ESOP Security Financial Services, Inc., a full-service brokerage affiliate, in order to assist you with acquisition of various investments.

BEAKLEY & ASSOCIATES, P.C. provides economic and investment analysis of any potential investment opportunities.

We will help you analyze the economic viability of an investment, while considering its impact on your total financial situation. Our professionals can also research projected trends and patterns in all areas of investment including oil and gas, real estate, agriculture, leasing, life insurance and others, providing you with the information needed to make a

> sound, knowledgeable decision. We invest our
> time and expertise in offering reliable and
> beneficial financial advice to our clients.

11.     The Douglasses are informed and believe that Defendant **FLP Management, Inc.** is an entity with its principle place of business located at 7004 Slide Rd., Lubbock, Texas 79424, 6102 Chicago Avenue, Lubbock, Texas 79424, and/or 2604 Texas Avenue, Lubbock, Texas 79411. Its president, director, and registered agent is former Defendant John William Beakley. (See Exhibit O). It is a Texas corporation apparently owned by former defendant John W. Beakley and was apparently created to serve as the general partner for certain limited partnerships, including the DEL entities described herein (and as further described, below). (See Receiver's Report, Dkt 150, page 6 of 23, such copy also attached hereto as Exhibit Q) FLP Management was a vehicle through which distributions would be made to Plaintiffs. (See Receiver's Report, Dkt 150, page 6 of 23, such copy also attached hereto as Exhibit Q)

### *The Mama Mia's Related Defendants*

MAMA MIA PIZZA KITCHEN, LTD.;
MMPK RESTAURANTS, INC.;

12.     The Douglasses are informed and believe that Defendant **Mama Mia Pizza Kitchen, Ltd.** is an entity with its principle place of business located at 7004 Slide Rd., Lubbock, Texas 79424, 6102 Chicago Avenue, Lubbock, Texas 79424, and/or 2604 Texas Avenue, Lubbock, Texas 79411. Its registered agent is former defendant John William Beakley. (See Exhibit O) It is a Texas limited

partnership, with the limited partner being former defendant John W. Beakley and the general partner being MMPK Restaurants, Inc., defendant herein. (See Receiver's Report, Dkt 150, page 6 of 23, such copy also attached hereto as Exhibit Q)  This entity appears to have been involved in the operation of a pizza restaurant in Levelland, Texas until January 2010.  (See Receiver's Report, Dkt 150, page 8 of 23, such copy also attached hereto as Exhibit Q)

13.    The Douglasses are informed and believe that Defendant **MMPK Restaurants, Inc.** is an entity with its principle place of business located at 7004 Slide Rd., Lubbock, Texas 79424, 6102 Chicago Avenue, Lubbock, Texas 79424, and/or 2604 Texas Avenue, Lubbock, Texas 79411. Its president, director, and registered agent is former defendant John William Beakley (See Exhibit O). It is a Texas corporation whose stock is owned by former defendant John W. Beakley. (See Receiver's Report, Dkt 150, page 16 of 23, such copy also attached hereto as Exhibit Q)   This entity appears to serve as the general partner of Mama Mia Pizza Kitchen, Ltd., defendant herein. (See Receiver's Report, Dkt 150, page 16 of 23, such copy also attached hereto as Exhibit Q)

### *The I-27 Defendants*

I-27 POWERSPORTS, INC.;
I-27 MARINE & RV, LTD.

14.    The Douglasses are informed and believe that Defendant **I-27 Powersports, Inc.** is an entity with its principle place of business located at 7004 Slide Rd., Lubbock, Texas 79424, 6102 Chicago Avenue, Lubbock, Texas 79424, and/or 2604 Texas Avenue, Lubbock, Texas 79411. Its president, director, and registered agent is former defendant John William Beakley. (See Exhibit O) Its

stock is owned by former defendant John Beakley, although the Douglasses were advised that they also had ownership interests here. (For the former, see Receiver's Report, Dkt 150, page 12 of 23, such copy also attached hereto as Exhibit Q; for the latter, see Exhibit D hereto, which mentions this entity by name as one that the Douglasses own).

15.     The Douglasses are informed and believe that Defendant **I-27 Marine & RV, Ltd.** is an entity with its principle place of business located at 7004 Slide Rd., Lubbock, Texas 79424, 6102 Chicago Avenue, Lubbock, Texas 79424, and/or 2604 Texas Avenue, Lubbock, Texas 79411. Its registered agent is former defendant John William Beakley. (See Exhibit O). It is a Texas limited partnership. (See Receiver's Report, Dkt 150, page 13 of 23, such copy also attached hereto as Exhibit Q) FLP Management, Inc. is the general partner and owns 1% of the Class B partnership interests. (See Receiver's Report, Dkt 150, page 13 of 23, such copy also attached hereto as Exhibit Q) The remainder appears to be owned by the Douglass and Beakley families, respectively. (See Receiver's Report, Dkt 150, page 13 of 23, such copy also attached hereto as Exhibit Q)

***The Golf Course Defendants***

RANCHLAND HILLS GOLF CLUB, INC.;
RH REAL ESTATE DEVELOPMENT, LTD.;
RHRE ENTERPRISES, INC.;

16.     The Douglasses are informed and believe that Defendant **Ranchland Hills Golf Club, Inc.** is an entity with its principle place of business located at 7004 Slide Rd., Lubbock, Texas 79424, 6102 Chicago Avenue, Lubbock, Texas 79424,

and/or 2604 Texas Avenue, Lubbock, Texas 79411, with a golf club located in Midland, Texas. Its director, secretary, treasurer and registered agent is former defendant John William Beakley. (See Exhibit O). This is a Texas corporation whose stock is owned 2/3rd's by former Defendant John Beakley, and it operated an 18 hole golf course in Midland Texas (owned by RHRE as described below). (See Receiver's Report, Dkt 150, page 14 of 23, such copy also attached hereto as Exhibit Q)  This entity may own some mineral interests in an adjacent tract of land.  (See Receiver's Report, Dkt 150, page 14-15 of 23, such copy also attached hereto as Exhibit Q)

17.     The Douglasses are informed and believe that Defendant **RHRE Real Estate Development, Ltd.** is an entity with its principle place of business located at 7004 Slide Rd., Lubbock, Texas 79424, 6102 Chicago Avenue, Lubbock, Texas 79424, and/or 2604 Texas Avenue, Lubbock, Texas 79411. Its registered agent is former defendant John William Beakley. (See Exhibit O).  It is a Texas limited partnership with numerous limited partners, including former defendant John W. Beakley. (See Receiver's Report, Dkt 150, page 9 of 23, such copy also attached hereto as Exhibit Q)   RHRE Enterprises, Inc., defendant herein, serves as general partner.  (See Receiver's Report, Dkt 150, page 6 of 23, such copy also attached hereto as Exhibit Q)  It appears to have owned an 18-hole golf course in Midland, Texas, apparently operated by Ranchland Hills Golf Club, Inc., also a defendant herein.  (See Receiver's Report, Dkt 150, page 6 of 23, such copy also attached hereto as Exhibit Q)  Plaintiff Sam Douglass, at a minimum, was advised by former defendant John Beakley (acting in his representative capacities) on

numerous occasions that Plaintiff Sam Douglass owned this golf course or was a "partner" in this golf course with former defendant John Beakley (and all associated real property, fixtures, interests, entities, etc.).  Plaintiff Sam Douglass, at a minimum, is either an interest holder (legal or equitable) in and/or has unjustly enriched this entity.  Not only that, though, but Exhibit E, attached hereto and incorporated by reference, indicates that all of the Douglasses have an ownership interest in RH [sic] Real Estate Development, Ltd. (Class B Partnership units; allegedly originally invested $100,000).

18.    The Douglasses are informed and believe that Defendant **RHRE Enterprises, Inc.** is an entity with its principle place of business located at 7004 Slide Rd., Lubbock, Texas 79424, 6102 Chicago Avenue, Lubbock, Texas 79424, and/or 2604 Texas Avenue, Lubbock, Texas 79411. Its president, director, and registered agent is former defendant John William Beakley. (See Exhibit O). It serves as the general partner of Defendant RHRE Real Estate Development, Ltd. (See Receiver's Report, Dkt 150, page 9 of 23, and page 14 of 23 such copy also attached hereto as Exhibit Q)

### *The Dairy Queen Related Defendants*

COMMERCE RESOURCE GROUP;
DQ REAL ESTATE DEVELOPMENT, LTD.;

19.    The Douglasses are informed and believe that **Defendant Commerce Resource Group, Inc.** is an entity with its principle place of business located at 7004 Slide Rd., Lubbock, Texas 79424, 6102 Chicago Avenue, Lubbock, Texas 79424, and/or 2604 Texas Avenue, Lubbock, Texas 79411. Its director and registered agent is former defendant John William Beakley. (See Exhibit O).  It is

a Texas corporation whose stock is owned by former Defendant John W. Beakley. (See Receiver's Report, Dkt 150, page 16 of 23, such copy also attached hereto as Exhibit Q)  It serves as a "captive employee leasing company for executive and management staff for former Defendant Roundtable Corporation, former defendant Food Service Holdings, Ltd., and Beakley & Associates," P.C., defendant herein.  (See Receiver's Report, Dkt 150, page 16-17 of 23, such copy also attached hereto as Exhibit Q)  It appears that, upon information and belief, money/resources/accretion that the Douglasses provided to or that would have inured to the benefit of the Douglasses under former defendants Roundtable Corporation and Food Service Holdings, Ltd., upon information and belief, was then used to pay this related-party entity a fee to provide employees, without the same being provided to the Douglasses, upon information and belief.

20.    The Douglasses are informed and believe that Defendant **DQ Real Estate Development, Ltd.** is an entity with its principle place of business located at 7004 Slide Rd., Lubbock, Texas 79424, 6102 Chicago Avenue, Lubbock, Texas 79424, and/or 2604 Texas Avenue, Lubbock, Texas 79411. Its registered agent is former defendant John William Beakley. (See Exhibit O)  It is a Texas limited partnership, whereby FLP Management Inc., defendant herein, is the general partner and owns 1% thereof with the Beakley and Douglass families, respectively, owning the remainder.  (See Receiver's Report, Dkt 150, page 18 of 23, such copy also attached hereto as Exhibit Q)  It apparently owns real property that is leased to former defendant Roundtable Corporation.  (See Receiver's Report, Dkt 150, page 18 of 23, such copy also attached hereto as Exhibit Q)

***The Thermal Fluid Defendants***

THERMAL FLUID TECHNOLOGIES, LTD.;
THERMAL TECHNOLOGIES, INC.;

21.    The Douglasses are informed and believe that Defendant **Thermal Technologies, Inc.** is an entity with its principle place of business located at 7004 Slide Rd., Lubbock, Texas 79424, 6102 Chicago Avenue, Lubbock, Texas 79424, and/or 2604 Texas Avenue, Lubbock, Texas 79411. Its president, director, and registered agent is former defendant John William Beakley. (See Exhibit O).  Its stock is apparently owned by former defendant John W. Beakley.  (See Receiver's Report, Dkt 150, page 7 of 23, such copy also attached hereto as Exhibit Q)  It was apparently created to serve as the general partner of **Thermal Fluid Technologies, Ltd.** (See Receiver's Report, Dkt 150, page 7 of 23, such copy also attached hereto as Exhibit Q) (collectively, at times, "TFT").  Its registered agent is former defendant John William Beakley. (See Exhibit O).   Until the Receivership began, former Defendant Roundtable Corporation paid 100% of TFT's payroll.  (See Receiver's Report, Dkt 150, page 7 of 23, such copy also attached hereto as Exhibit Q)

***The Tierra De Tejas Defendants***

TIERRA DE TEJAS DEVELOPMENT, LTD.;

22.    The Douglasses are informed and believe that Defendant **Tierra de Tejas Development, Ltd.** is an entity with its principle place of business located at 7004 Slide Rd., Lubbock, Texas 79424, 6102 Chicago Avenue, Lubbock, Texas 79424, and/or 2604 Texas Avenue, Lubbock, Texas 79411. Its registered agent is former defendant John William Beakley. (See Exhibit O).  It is a Texas limited

partnership with FLP Management, Inc., defendant herein, serving as the managing general partner.  (See Receiver's Report, Dkt 150, page 20 of 23, such copy also attached hereto as Exhibit Q)  The Douglass family, Beakley family, and two third parties own portions thereof of the interests of same.  (See Receiver's Report, Dkt 150, page 20 of 23, such copy also attached hereto as Exhibit Q)

### *The Remaining Defendants*

FLP REAL ESTATE DEVELOPMENT, LTD.
MANNA REAL ESTATE DEVELOPMENT, LTD.;
LBC REAL ESTATE DEVELOPMENT, LTD.;

23.    The Douglasses are informed and believe that Defendant **FLP Real Estate Development, Ltd.** is an entity with its principle place of business located at 7004 Slide Rd., Lubbock, Texas 79424, 6102 Chicago Avenue, Lubbock, Texas 79424, and/or 2604 Texas Avenue, Lubbock, Texas 79411. Its registered agent is former defendant John William Beakley. (See Exhibit O).  FLP Real Estate Development, Ltd. is a Texas limited partnership, wherein FLP Management, Inc., defendant herein, is the General partner.  (See Receiver's Report, Dkt 150, page 18 of 23, such copy also attached hereto as Exhibit Q)  Although now it appears to be solely owned by the Beakley family, at one time the Douglasses believed they owned it.  That could be the reason, at least in part, for the finding that there is an outstanding liability to the Douglasses totaling approximately $28,000 (although the Douglasses are unaware of the transfer of any of their interests or the reason for the known outstanding liability).  (See Receiver's Report, Dkt 150, page 18 of 23, such copy also attached hereto as Exhibit Q)

24.    The Douglasses are informed and believe that Defendant **Manna Real Estate Development, Ltd.** is an entity with its principle place of business located at 7004 Slide Rd., Lubbock, Texas 79424, 6102 Chicago Avenue, Lubbock, Texas 79424, and/or 2604 Texas Avenue, Lubbock, Texas 79411. Its registered agent is former defendant John William Beakley. (See Exhibit O).  This is a Texas limited partnership, with FLP Management, Inc., defendant herein, as general partner.  (See Receiver's Report, Dkt 150, page 19 of 23, such copy also attached hereto as Exhibit Q)  This entity appears to have owned the real estate previously leased to Mama Mia Pizza Kitchen, Ltd., defendant herein.  (See Receiver's Report, Dkt 150, page 19 of 23, such copy also attached hereto as Exhibit Q).

25.    The Douglasses are informed and believe that Defendant **LBC Real Estate Development, Ltd.** is an entity with its principle place of business located at 7004 Slide Rd., Lubbock, Texas 79424, 6102 Chicago Avenue, Lubbock, Texas 79424, and/or 2604 Texas Avenue, Lubbock, Texas 79411. Its registered agent is former defendant John William Beakley. (See Exhibit O).  This entity is a Texas limited partnership allegedly now owned solely by FLP Management, Inc., as general partner, and defendant herein.  (See Receiver's Report, Dkt 150, page 19 of 23, such copy also attached hereto as Exhibit Q)  However, at one time (or through the current time), the Douglasses understand that they own or owned interests in this entity (to the extent disposed of without their awareness, possibly into the MP-1 defendant entity as referenced herein; see Exhibit E).

**D.   John Doe Defendants**

26.    Upon information and belief, the John Doe Defendants are entities through

whom the Douglasses' money was invested or otherwise was used to benefit; they are entities who are liable as principal of the conduct complained of herein, they are persons or entities that conspired, aided and abetted, controlled, and/or participated in the actions complained of herein, and they are persons or entities who have been unjustly enriched, at the very minimum.  They are and reasonably should be on notice of this complaint and its predecessor. Some of these entities may include formerly named defendants that are not included herein based on the Receiver's preliminary findings concerning these entities.  Should the information provided to the Receiver be incorrect, these defendants may be implicated herein depending on the level of misinformation.  (See Receiver's Report, Dkt 150, such copy also attached hereto as Exhibit Q)

27.     Exhibits D and E hereto list the entities that the Defendants apparently admit that the Douglasses own an interest in.  It is believed that there are others (see the John Doe Defendants, for example, and Equilait, Ltd.).  But for purposes of this complaint, when an allegation or averment refers to those entities that the Douglasses were invested in, it is referring to those entities unless the context requires otherwise (and in no event is this complaint directed to those former defendants identified in Exhibits D and E that have filed for bankruptcy protection).  These entities include:  former defendant Roundtable Corporation, former defendant Roundtable Corporation's former defendant RCDQ subsidiaries, former defendant Food Service Holdings, Ltd.; former defendant Concert Management, Ltd.; Tierra de Tejas Development, Ltd.; I-27 Marine & RV, Ltd.; I-27 Powersports, Inc.; MP1 (or MP-1, at times) Real Estate Development, Ltd.;

LBC Real Estate Development, Ltd.; RH Real Estate Development, Ltd.; Manna Real Estate Development, Ltd.; FLP Real Estate Development, Ltd.; DQ Real Estate Development, Ltd.; Thermal Fluid Technologies, Ltd.; and Mama Mia Pizza Kitchen, Ltd.[1]  Several of these entities have general partners that are identified herein that would have been acting with them to the extent applicable (such as in the context of one of these entities making a representation or omission, for instance).

28.    All Defendants complained of in this complaint will collectively be referred to, at times, as "**Defendants.**"

## V.    <u>RELATED INDIVIDUALS AND ENTITIES (NON-PARTIES, FOR CONTEXT)</u>

29.    **Former Defendant John William Beakley** - The Douglasses are informed and believe that former Defendant John William Beakley is an individual person who may be found at 7004 Slide Rd., Lubbock, Texas 79424, 6102 Chicago Avenue, Lubbock, Texas 79424, and/or 2604 Texas Avenue, Lubbock, Texas 79411. Former defendant John William Beakley's Texas Accountant license number is 025531 issued on April 29, 1981. In addition to his various official titles and official connections to the facts of this case and the Defendants involved herein, former defendant John William Beakley was an "overseer" of the Entity Defendants involved in this case.  (See Exhibit D)

30.    **Former Defendants Roundtable Corporation & its RCDQ**

---

[1] Also included previously that would be identified within these exhibits is former Defendant DFJV Equipment Leasing, Ltd. is understood by former Defendant John W. Beakley to be now owned completely by

**Subsidiaries**- The Douglasses are informed and believe that Roundtable Corporation is an entity with its principle place of business located at 1000 Emerald Isle Drive, Suite 101, City of Dallas, Dallas County Texas 75218, 7004 Slide Rd., Lubbock, Texas 79424, 6102 Chicago Avenue, Lubbock, Texas 79424, and/or 2604 Texas Avenue, Lubbock, Texas 79411. Its president, director, and registered agent is former Defendant John William Beakley. According to former Defendant John William Beakley, Roundtable Corporation and its RCDQ subsidiaries own and operate 85 Dairy Queen restaurants in Texas, New Mexico, and Oklahoma. (See Exhibit D).

31.    On or about the date of filing of the original complaint and, in most cases, immediately prior thereto, approximately 90 defendants originally named therein have filed for bankruptcy protection.  Three individuals have since filed for Chapter 7 bankruptcy protection.  Although many of the allegations made in this complaint center around actions and inactions taken by or on behalf of former defendant John William Beakley, who has filed for Chapter 7 bankruptcy protection, this complaint does not attempt to state any claims against him arising out of this past conduct, and should not be construed as attempting to state any claims against, nor attempting to take any action against, former defendant John William Beakley. Nor is it intended, nor should it be construed, as taking any action against any interest of his in bankruptcy, nor is any effort made to do anything that would allegedly violate an automatic stay. All actions taken by former defendant John William Beakley are attributable to one or more of the

---

Plaintiff Sam Douglass.  (See DKT. 150, page 20 of 23).  Accordingly, the plaintiffs are relying on former defendant

named Defendants herein based on, generally speaking, principles of agency, as explained herein, such that these entities are liable for his alleged actions and inactions as he was the authorized agent, he was often the sole and only president/director, he was acting in the course and scope of his employment/agency, and he appears to have the full authority to act on behalf of these entities.   Also, although still Defendants in this action, Defendant Michael John Beakley and Meghan Snodgrass Beakley have, based on last-known information, filed for Chapter 7 bankruptcy protection.  Accordingly, no action is being taken in this complaint or in this case against them or any interest thereof (nor are they named herein as a result).  Furthermore, although also mentioned herein, the entities in the Chapter 11 Bankruptcy cases in the Eastern District of Texas (Roundtable Corporation, the RCDQ entities, Concert Management, Ltd. and its apparent general partner, The Weddington Group, Inc., Food Service Holdings, Ltd. (FSH), Food Service Management Associates, Inc., as general partner thereof, etc.) are also not the subject of any claim for relief in this complaint or in this case as they are also in the bankruptcy process (nor is any action intended or actually taken against them or any interest thereof in any way). If and when these entities/persons are mentioned herein, it is for context and/or other appropriate purpose or to show an agency relationship; no action or complaint is made against same in any way at this time (nor is any effort made to do anything that would allegedly violate an automatic stay) due to the bankruptcy filings and the protections under the United States Bankruptcy laws.   When

---

John W. Beakley's representations in that regard.

allegations are made as to former defendant John W. Beakley, they should be understood at all times to be allegations against John W. Beakley acting in a representative capacity for other defendants, as applicable. At all times, this Amended Complaint should be construed with that understanding in mind, and if in doubt, please contact the undersigned for any needed or further assurances or clarity on this issue.

## VI.    JURISDICTION AND VENUE

32.    This action arises under the Investment Advisor Act, 15 U.S.C. §80b, *et seq*. This Court has original jurisdiction over this controversy pursuant to 28 U.S.C. §§1331 and 1367 and 15 U.S.C. § 80b-14.

33.    Many of the transactions, acts, practices, and courses of business alleged herein took place in the Northern District of Texas, and specifically in the Lubbock and Dallas Divisions thereof.

34.    Each known individual person that is a named Defendant is a resident of the Northern District of Texas and a resident of the State of Texas, has substantial business in Texas and the Northern District of Texas, and has purposefully availed himself or herself, as applicable, of the rights and privileges of conducting business in Texas, including the Northern District of Texas. Most individual persons that are a named Defendant reside in the Lubbock Division or Dallas Division of the Northern District of Texas.

35.    Each known entity that is a named Defendant is a resident of the Northern District of Texas, a resident of the State of Texas, has substantial business in Texas and the Northern District of Texas, and has purposefully availed itself of the rights and privileges of conducting business in Texas, including the Northern

District of Texas, and specifically in the Lubbock and Dallas Divisions thereof.

36.    As such, venue in this judicial district is proper under 28 U.S.C. §§ 1391 (b) and (c), and the Court has personal jurisdiction over each Defendant.

## VII.    STATEMENT OF FACTS

### A.    Background Facts

37.    Approximately eleven years ago, the wife of Plaintiff Sam Douglass and the mother of Plaintiffs Mark, Scott and Tim Douglass was killed in a tragic accident. The Douglasses received payment in the approximate amount of $9,400,000 (U.S.) for the loss of her life through an out of court settlement.

38.    Following the death of Mrs. Douglass, former Defendant John William Beakley, acting on behalf of at least Beakley & Associates, P.C., approached the Douglasses and suggested that they allow him by and through Defendant Beakley & Associates, P.C., to serve as an investment adviser.

39.    Former Defendant John William Beakley held himself out to be one of Sam Douglass's best friends – the two having known each other since the 1980's. He tried to act as if he were a mentor and friend to the remainder of the Douglasses, while at the same time professing his expertise as an investment adviser. The remainder of the Individual Defendants herein also held themselves out as friends of the Douglasses. These families had known each other since the 1980's. They attended church together; they grew up together; they were close, close family friends. There was a special relationship of trust and confidence between them.

40.    The Douglasses were in a quandary about what to do with that sum of money, as they were not sophisticated investors and had never been privy to

anything of the sort.  Plaintiff Sam Douglass was concerned about investing in any arrangement whereby investments could end up in "sin stocks," and he wanted to make sure his and his family's money did not end up invested in such "sin stocks."  Former defendant John Beakley, acting on behalf of Beakley & Associates, P.C. at all times, convinced the Douglasses that he/they would be best to manage the money and to, *inter alia,* ensure no "sin stocks" were involved, in large part because of their longstanding familial, church, and accounting relationship.

41.     The Douglasses are not sophisticated investors or accredited investors and have never been. Plaintiff Sam Douglass is a retired Baptist preacher and now life coach. His sons are not sophisticated investors, but are employed in such jobs as teachers and photographers, respectively, for instance. All have families, with children of their own, and the money that represented their mother's life was planned to be used to provide residual income for the remainder of their lives and to make a better life for each of their families, and was not intended to be put at any meaningful risk (at least not anywhere near the risk that it was apparently placed in this case).

42.     Former Defendant John William Beakley told the Plaintiffs that they could rely upon him and Defendant Beakley & Associates, P.C. to see to it that their best and financial interests were looked out for and safely cared for.  They were told repeatedly throughout the course of their relationship by former Defendant John William Beakley acting on behalf of Beakley & Associates, P.C. and also later on behalf of FLP Management, Inc., that they "would never have to worry

about retirement."

43.    So the Douglasses decided to invest their money under the advice and care of former Defendant John William Beakley and Defendant Beakley & Associates, P.C.

44.    After the decision to invest was made and the process was underway, former defendant John William Beakley and Beakley & Associates, P.C. caused each of the Douglasses to initially form two types of entities to allegedly help with the investing – each with similar names and functions for each of the Douglass family members.

45.    Former Defendant John William Beakley and Beakley & Associates, P.C. drafted and formed entities named "Douglass Enterprises Limited L.P." for each individual Plaintiff – with each individual Plaintiff's initials preceding the commonly termed "Douglass Enterprises Limited L.P." For the purposes of clarity, these limited partnerships shall be referred to as "DEL's."  As understood presently, each individual Plaintiff's DEL was designed by former defendant John William Beakley and Beakley & Associates, P.C. to be an asset holding company from which each individual's assets would be invested.  As understood presently, in 2001, each of the individual Plaintiff's DELs was funded with approximately 2.5 Million Dollars (but not more than the cumulative amount referenced above, in total).  This was done solely at the direction of former defendant John William Beakley and Beakley & Associates, P.C. (and presumably, at some point later, through FLP Management, Inc., the general partner of the DEL's), and these entities never existed prior to the decision to invest and their agreement that

former Defendant John William Beakley and Beakley & Associates, P.C. would serve as the Douglasses' investment adviser.  .

46.    In addition, again after the investment decision was made and underway, former defendant John William Beakley and Beakley & Associates, P.C. drafted and formed entities named "Douglass Enterprises Management Inc." for each individual Plaintiff.   Again, these "DEMS" were each assigned the initials of the individual family member.  As presently understood, each DEM was designed and drafted by former defendant John William Beakley (and in his representative capacity on behalf of Beakley & Associates, P.C.) to be one of two General Partners of each DEL.  At all relevant times, each DEM is believed to have been owned by their corresponding individual Plaintiff (but this may have changed at some point unbeknownst to Plaintiffs; it is unclear at this point what role the DEL's and the DEM's have in this case in terms of culpability, if any).   So essentially, although these entities were limited partnerships that were allegedly in the name of the Douglasses, they were controlled completely and solely by former defendant John W. Beakley and Beakley & Associates, P.C. initially, and later FLP Management, Inc. as general partner also exercised control.

47.    But former defendant John William Beakley and Beakley & Associates, P.C. drafted (and executed) each DEL to maintain nominal Defendant FLP Management, Inc. as each DEL's "Managing" General Partner.  As indicated in the above section, FLP Management, Inc. served as the general partner of numerous entities in this case, and it wore many hats.  At all times relevant to this lawsuit, upon information and belief, FLP Management, Inc. has been owned and

operated by former defendant John William Beakley as its Director and Principle

Officer (see, in part, the excerpt of Exhibit D below, "FLP Management, Inc. -

.1% as Managing General Partner (100% John Beakley)").   Upon information

and belief, at all times relevant to this lawsuit, former defendant John William

Beakley and Beakley & Associates, Inc., as applicable, have used FLP to

exclusively control the Plaintiff DELs and to select and maintain investments

owned by the individuals without adequate disclosures or suitability assessments

being made. (See Exhibit D, September 16, 2010 letter from former Defendant

John William Beakley explaining this structure, excerpted below):

```
M.N. Douglass Enterprises, Ltd.
        FLP Management, Inc. - .01% as Managing General Partner (100% John Beakley)
        M.N. Douglass Enterprise Management, Inc. - .99% as General Partner (100% Mark Douglass)
        Mark Douglass - 99.00% as Limited Partner

S.P. Douglass Enterprises, Ltd.
        FLP Management, Inc. - .01% as Managing General Partner (100% John Beakley)
        S.P. Douglass Enterprise Management, Inc. - .99% as General Partner (100% Scott Douglass)
        Scott Douglass - 99.00% as Limited Partner

T.K. Douglass Enterprises, Ltd.
        FLP Management, Inc. - .01% as Managing General Partner (100% John Beakley)
        T.K. Douglass Enterprise Management, Inc. - .99% as General Partner (100% Tim Douglass)
        Tim Douglass - 99.00% as Limited Partner
```

\*       \*       \*

```
Sam Douglass has an identical organizational arrangement for his assets.
```

\*       \*       \*

48.     Beakley & Associates, P.C. and FLP Management, Inc., upon information

and belief, began investing the Douglasses money into related entities that were

also, upon information and belief, controlled by the Beakley family (or entities

owned by the Beakley family).   When Beakley & Associates and FLP

Management, Inc. invested in these related entities, the structure of the various investments was generally understood to be as follows (See Exhibit D, September 16, 2010):

---

My arrangement with Douglass is that they are not ever asked to provide personal guarantees related to any of the investments. They understand that they can lose one of the investments if it fails to meet its financial obligations, but they can not lose everything from one investment. The structure of most of the investments is through limited partnerships which are structured similarly as follows:

Limited Partnership
FLP Management, Inc. (or another corporation) - 1% General Partner (100% John Beakley)
S.K. Douglass Enterprises, Ltd. - 12.5% Limited Partner (Sam Douglass)
M.N. Douglass Enterprises, Ltd. - 12.5% Limited Partner
S.P. Douglass Enterprises, Ltd. - 12.5% Limited Partner
T.K. Douglass Enterprises, Ltd. _ 12.5% Limited Partner
John & Mary Beakley - 24% Limited Partner
Michael Beakley - 6.25% Limited Partner
Amy Beakley - 6.25% Limited Partner
Joel Beakley - 6.25% Limited Partner
David Beakley - 6.25% Limited Partner

---

49.     Upon information and belief, the purpose of this structure was to unilaterally give the Beakley family members (the Individual Defendants herein) ownership interests equal or equivalent to the total interests owned by   the Douglass families (see Exhibit D, September 16, 2010, "In this process, wherever possible I have attempted to equalize and align the Beakley family and Douglass family members in terms of ownership and capital interests."), although the Beakley family members, upon information and belief, provided little or de minimus capital contributions for their respective ownership (or at least not at the level that the Douglasses provided for an equalized share).  This was explained by former Defendant John William Beakley and/or Beakley & Associates, Inc., as follows:

In this process, wherever possible I have attempted to equalize and align the Beakley family and Douglass family members in terms of ownership and capital interests. When this investment process was first proposed in 2001, I believed that a fair rate of return would be 8.50% before tax and 5.5% on an after tax basis. While these rates were both fair and achievable at the time they were proposed (and we have achieved these rates so far), who knows what future rates will be appropriate for a given level of risk? Douglass and Sam Douglass currently are being distributed approximately $330,000 in annual cash distributions. Additionally, with appropriate lead time, Douglass is/are distributed additional amounts related to home purchases, auto purchases, individual business start-up costs, and paying for babies.

50.    A portion of the known entities which former defendant John William Beakley, FLP Management, Inc., and Beakley & Associates invested the Douglasses' money in included (according to former Defendant John William Beakley, see Exhibit D, September 16, 2010):

1.    Roundtable Corporation & its RCDQ Subsidiaries & Food Service Holdings, Ltd. - owns and operates 85 Diary Queen restaurants in Texas, New Mexico, and Oklahoma.

DQ Real Estate Development, Ltd. - purchases, develops, and sells Dairy Queen properties into the sale lease-back market

Concert Management, Ltd. - originally owned approximately 31 Dairy Queen old franchise agreements; these have been upgraded into current franchise agreements with American Dairy Queen, and converted into cash which has been used for capital/asset expansion of Roundtable Corporation

Tierra de Tejas Development, Ltd. - acquires real estate, develops neighborhoods, and builds sold/custom homes in San Benito and Harlingen, Texas

I-27 Marine & RV, Ltd. - owns and operates a Chaparral boating dealership in Lubbock, Texas

I-27 Powersports, Inc. - owns and operates a Polaris (Rangers & ATVs) and Suzuki (motorcycles & ATVs) dealership in Lubbock, Texas

MP1 Real Estate Development, Ltd. - owns the real estate and improvements leased to both I-27 entities

RH Real Estate Development, Ltd. - owns the real estate and golf course improvements and facilities leased to Ranchland Hills Golf Club, Inc. (semi-private golf club) in Midland, Texas

Manna Real Estate Development, Ltd. - owns the real estate and restaurant facility and equipment that was formerly leased to Mama Mia Pizza Kitchen, Ltd. (business was closed effective as of 12/31/09) in Levelland, Texas - this property is being retained for use as a Dairy Queen facility once we purchase the Levelland franchise for which we are currently in negotiations

FLP Real Estate Development, Ltd. - Douglass has very little funds remaining in this entity which used to own the office building leased to Beakley & Associates, P.C. in Lubbock, Texas which was sold to a third party in the sale lease-back market.

51.    Yet, interestingly enough, Exhibit E is a Master Account ledger/spreadsheet, a copy of which is attached hereto and incorporated by

reference, showing additional investments by the Douglasses in Mama Mia Pizza Kitchen, Ltd., at a minimum, in addition to the ones described above ("Mama Mia Pizza Kitchen, Ltd. – 37.5% limited partnership"). So, at the very minimum, according to former defendant John William Beakley's own words, the Douglass' money was invested in at least these entities, as well (and the accounts are inconsistent).

52.    Plaintiff Sam Douglass was advised by former defendant John William Beakley that he also, at a minimum, was "invested in" or was a "partner of" Defendant Thermal Fluid Technologies, Inc.  An excerpt of Exhibit D, attached hereto, mentions an investment in Thermal Fluid Technologies, Ltd.:

> I maintain approximately $30,000,000 in term life insurance just in case I die prematurely. This would provide sufficient capital for additional working capital, and the purchase of the Douglass interests in the event they wanted to sell. Additionally, as we continue to expand the executive staff, many of our employees have expressed a desire to purchase interests in the Companies. These opportunities as well as potential sales to the ESOP will provide a market for Douglass to sell their interests in the various companies. The long-term goals for these entities is not to be the biggest at what we do, but rather, to be the most profitable at what we do. I continue to look for opportunities to diversify into other investments. Sam Douglass is also invested in Thermal Fluid

> Technologies, Ltd. - a manufacturer of cutting fluids for machining operations, and DFJV Equipment Leasing, Ltd. - a venture put together to assist his brother in law who farms in the south Texas area. We are currently in the development stages of a venture with the Amish community in Jamesport, Missouri to provide spray dried mare's milk as a pro-biotic for people who suffer from Crones disease, Colitis, and Irritable Bowel Syndrome. Packaging development, labeling, and initial marketing analysis is in process and we have procured approximately 2,400 pounds of mare's milk for packaging which is currently being stored in Dallas, Texas. This venture has been established under a limited partnership called Equilait, Ltd.

53.    During telephone conferences between Plaintiff Sam Douglass and former defendant John William Beakley (occurring at various times throughout the past years), Plaintiff Sam Douglass was advised by former defendant John William Beakley, in his representative capacities, that he also, at a minimum, was "invested in" or was a "partner of" the Ranchland Hills Defendants. Although the

specific entities were never described with particularity by former defendant John W. Beakley in his representative capacities, Plaintiff Sam Douglass was told and understood he owned interests in the "golf course," and all aspects thereof. Plaintiff Sam Douglass understood from those conversations that at least $100,000 of his money was invested therein. This is also corroborated, at least in part, by the spreadsheet attached as Exhibit E, wherein the "RH Real Estate Development, Ltd." entity and ownership interests of "Class B limited partnership units" are described, but they appear to be contributed to each of the Douglasses (or at least not specifically limited to Plaintiff Sam Douglass). This is also true for the notation in Exhibit D – noting the RH Real Estate Development, Ltd. ownership.

54.     Plaintiffs are also believed to be invested in an entity identified as "Equilait, Ltd." that was at least trying to develop and sell dehydrated mare's milk at least as of September 16, 2010 (identified as Equilait, Ltd., a search of which yields that former defendant John W. Beakley is the registered agent and the entity is apparently headquartered at the same location as many of these entities – 6102 Chicago Avenue, Lubbock, TX 79424, the same location as Beakley & Associates, P.C.). An excerpt of Exhibit D is attached below wherein this is mentioned, and especially in the "we" context, but the dates and amounts of Plaintiffs' investments and the structure of this entity are unknown:

Technologies, Ltd. - a manufacturer of cutting fluids for machining operations, and DFJV Equipment Leasing, Ltd. - a venture put together to assist his brother in law who farms in the south Texas area. We are currently in the development stages of a venture with the Amish community in Jamesport, Missouri to provide spray dried mare's milk as a pre-biotic for people who suffer from Crones disease, Colitis, and Irritable Bowel Syndrome. Packaging development, labeling, and initial marketing analysis is in process and we have procured approximately 2,400 pounds of mare's milk for packaging which is currently being stored in Dallas, Texas. This venture has been established under a limited partnership called Equilait, Ltd.

55.    Upon information and belief, at all times and in all communications concerning these investments, former Defendant John Beakley acted as agent on behalf of and with the complete authority of the entities named herein. Upon information and belief, he acted in the course and scope of his employment and agency.   He was, for all intents and purposes, based on information and belief, the only agent able to act on behalf of same (either individually or through another entity that acted as general partner, for instance, that he was the only agent able to act on behalf of, for instance).   These entities include, at the very minimum, the Entity Defendants identified herein, namely: BEAKLEY & ASSOCIATES, P.C.; FLP MANAGEMENT, INC.; FLP REAL ESTATE DEVELOPMENT, LTD.; MAMA MIA PIZZA KITCHEN, LTD.; MMPK RESTAURANTS, INC.; I-27 POWERSPORTS, INC.; I-27 MARINE & RV, LTD.; RANCHLAND HILLS GOLF CLUB, INC.; RHRE ENTERPRISES, INC.; RHRE REAL ESTATE DEVELOPMENT, LTD.; MANNA REAL ESTATE DEVELOPMENT, LTD.; THERMAL FLUID TECHNOLOGIES, LTD.; THERMAL TECHNOLOGIES, INC.; TIERRA DE TEJAS DEVELOPMENT, LTD.; LBC REAL ESTATE DEVELOPMENT, LTD.; COMMERCE RESOURCE GROUP; and DQ REAL ESTATE DEVELOPMENT, LTD.

56.    So when former defendant John Beakley is alleged to have made a misleading or fraudulent statement herein that is actionable as they pertain to each of these respective entities, each of these respective entities are equally and jointly and severally liable for such actionable statements as it is as if they made them

(realizing that entities can only act through individuals, as a practical matter). When former Defendant John Beakley is alleged to committed a wrong and it involved one or more of these entities, each of these entities are equally and jointly and severally liable for such wrongs under common law and Texas entity laws concerning principal/agent liability, part of which is explained later in this complaint for the avoidance of any doubt.

57.     For the Douglasses, trying to determine exactly where the money went and how all of these entities relate to one another is terribly complicated.  This, coupled with the lack of information available to them, makes it extremely difficult to try to parse through exactly what happened and why.  And it tremendously, tremendously hampers the efforts of the Douglasses to determine where their money went, who was enriched by their investments, and how all of this transpired.  Ultimately, approximately $9.4 Million went into these entities and investments (and potentially more), and it appears now to be completely gone or greatly diminished (and the exact value is unknown).

58.     It appears that there were a number of tremendous accounting difficulties that plagued each of the entities described herein (including the Entity Defendants). At least over the past couple of years, former Defendant Roundtable Corporation began being the primary source of funds to stabilize the remainder of the entities.  (See Receiver's Report, Dkt 150, page 4 of 23, such copy also attached hereto as Exhibit Q, which states "Prior to the entry of the Receivership Order, funds from the profitable businesses, most notably [former defendant] Roundtable Corporation, were used to pay operating expenses and offset losses of

the unprofitable businesses.   In large part, cash from [former defendant] Roundtable Corporation sustained the operations of the entities currently subject to the Receivership Order.").   Former Defendant Roundtable Corporation is owned, in part, by the Douglasses.   So when Roundtable Corporation did this, Roundtable was using the Douglasses' money, or money that the Douglasses had an interest in, at a minimum, to fund other entities, some of which are described herein, that the Douglasses may or may not have had an interest in.   That was inappropriate.

59.     Additionally, funds and assets of these entities (including the Entity Defendants herein and former defendants hereto) have been extensively comingled, such that once again, entities that the Douglasses were allowed/provided an interest in may have been supporting entities that they were not allowed/provided an interest in.   (See Receiver's Report, Dkt 150, page 4 of 23, such copy also attached hereto as Exhibit Q, which states "Assets belonging to these entities have been extensively commingled.").   That is not appropriate.   At the very, these entities that were supported by Douglass-owned entities (including the Entity Defendants) have been unjustly enriched (or similar).

60.     Furthermore, to keep track of the numerous transfers between the various persons and entities, a universal "deduct", "due to/due from" (or similar, this was referenced in one of the hearings on the receivership early-on, although a transcript has not been reviewed, admittedly, and this is based on recollection) designation was developed – essentially tying the deduction back to former defendant John Beakley, generally speaking, instead of attempting to account for

exactly where the money went, who it was owed to, etc. This created an accounting problem, and it also serves now to frustrate the accounting necessary to attempt to figure out where all the money went.

61.    Upon information and belief, none of the above accounting difficulties, intermingling, and support by former Defendant Roundtable Corporation was ever relayed to the Plaintiffs in any of the communications mentioned below or otherwise. The Douglasses believe that these are material omissions that were intentionally not made to discourage the Plaintiffs from stopping the investment arrangement (in each of the known communications, some of which are described below).

62.    Additionally, former Defendant John William Beakley and Beakley & Associates, P.C. advised the Douglasses that they would obtain all necessary licensure to buy, sell, and trade securities and to provide investment advice, yet they did not. In fact, three years prior to the investment relationship with the Douglasses beginning, Beakley & Associates, P.C. (understood to be the same or successor entity as Beakley, Garrett, and Associates, P.C. minus one named partner/shareholder and possibly other employees, upon information and belief) applied to be an investment advisor through the State of Texas. Such application is attached as Exhibit S. In that application, there are numerous statements by Beakley & Associates, P.C. and former defendant John Beakley about the number of clients that they were currently advising concerning investments. Upon information and belief, after the State of Texas asked about those current investors, the application process seemed to stop completely. In other words, it

appears that Beakley & Associates, P.C. realized that it may have had an issue for doing investment adviser work without obtaining the necessary license/certification, so the application process appears to have stopped based on no other known subsequent response or known application being submitted (yet the advising certainly did not, at least as to these Plaintiffs and others).

63.     As general partner of many of the entities involved herein, including the entities that were set up by former Defendant John Beakley and Beakley & Associates, P.C. (like the DEL's or the DEM's, through corporate relationship, as applicable), upon information and belief, Defendant FLP Management, Inc. also began serving as an investment advisor as it was, as general partner, through former defendant John Beakley, apparently also making decisions about where to put the Douglasses' money.  As the general partner, presumably everything the DEL's or DEM's did with the Douglasses money, for instance, was known and authorized by the general partner.

64.     At first former Defendant John William Beakley, Beakley & Associates, P.C., and/or FLP Management, Inc. advised that they would purchase, sell, manage, and monitor the performance of a portfolio of publicly traded stocks for the benefit of the Plaintiffs. (See Exhibit D, September 16, 2010 letter from former Defendant John William Beakley):

When we began this investment management arrangement, we originally invested about $2,500,000 in publicly traded stocks and $3,000,000 in municipal bonds.  All of this was done after significant discussions and educational meetings with Douglass. As you and I discussed, the actual investing activities all began the week of September 11, 2001.  Once the markets recovered from that horrific event, the markets were once again subjected to the throws of the Enron and TICO International accounting/fraud scandals and dropped precipitously. This drove home to Douglass just how volatile the public markets can be, and quite frankly it scarred them. Not to place myself above the fray, it didn't help my confidence levels either. At that time approximately half of their funds had been designated for real estate and closely held ventures. After the markets recovered all of the stocks and bonds were liquidated at a significant gain and the proceeds were reinvested in what were believed (at the time) to be more stable/safer investments.

65.    In the preceding paragraph, note that former Defendant John William Beakley indicated that "[a]fter the markets recovered all of the stocks and bonds were liquidated ***at a significant gain*** and the proceeds were reinvested in what were believed (at the time) to be more stable/safer investments."  (See Exhibit D, emphasis added).  As such, the amount of Douglass funds ultimately invested that are herein complained of appears to have been much greater than the approximate $9.4 Million (although the exact amount of that gain is unknown except that it was a "significant" one).  The damages complained of in this case are accordingly extended to that amount, but only Defendants (or a subset, at least Beakley & Associates, P.C. and/or FLP Management, Inc.) know(s) what it was.

66.    Note this was admittedly and a self-described "investment arrangement." (See Exhibit D, September 16, 2010 letter from former Defendant John William Beakley, the excerpt immediately above – "When we began this investment arrangement. . . ")  Note that there were "[t]arget earnings" of same – 5.5% non-taxable/8.5% taxable (See Exhibit E, excerpted below):

| Douglass Enterprises - Master Account Investment Earnings - Annualized Analysis Status as of December 31, 2008 | | |
|---|---|---|
| Description | | Initial Invested Capital |
| Initial Target earnings - non-taxable (5.50%): | $ | 9,433,464 |
| Initial Target earnings - taxable (8.50%): | $ | 9,433,464 |

67.    Then the plan apparently changed.  Upon information and belief, apparently without proper registration, former defendant John William Beakley, Beakley & Associates, P.C., and/or FLP Management, Inc. began offering and selling investments and investment arrangements to the Douglasses through the

form of interests in various entities owned and controlled by former Defendant John William Beakley. At times former Defendant John William Beakley, Beakley & Associates, P.C., and/or FLP Management, Inc. appear to have acted completely and unilaterally on the Douglasses' behalf as the buyer and seller of such interests; deciding what they should invest in, how much they should invest, and what percentage, if any, the Douglasses would own in whatever entity they ultimately invested in. Seldom was notice provided; seldom was documentation provided. Upon information and belief these investment advisers also issued equal or similar ownership interests to the Beakley family members (see Exhibit D, excerpted below):



My arrangement with Douglass is that they are not ever asked to provide personal guarantees related to any of the investments. They understand that they can lose one of the investments if it fails to meet its financial obligations, but they can not lose everything from one investment. The structure of most of the investments is through limited partnerships which are structured similarly as follows:

Limited Partnership
FLP Management, Inc. (or another corporation) - 1% General Partner (100% John Beakley)
S.K. Douglass Enterprises, Ltd. - 12.5% Limited Partner (Sam Douglass)
M.N. Douglass Enterprises, Ltd. - 12.5% Limited Partner
S.P. Douglass Enterprises, Ltd. - 12.5% Limited Partner
T.K. Douglass Enterprises, Ltd. - 12.5% Limited Partner
John & Mary Beakley - 24% Limited Partner
Michael Beakley - 6.25% Limited Partner
Amy Beakley - 6.25% Limited Partner
Joel Beakley - 6.25% Limited Partner
David Beakley - 6.25% Limited Partner

68. Although the exact dates and amounts of most of these sales, transfers, offers, purchases, etc. are unknown – they are, upon information and belief, believed to have happened continuously and systematically throughout the course of the parties' relationship..

69. At all relevant times, former defendant John William Beakley, FLP Management, Inc. and/or Beakley & Associates, P.C. appears to have exercised complete discretion and control in investing and using Plaintiffs' funds, without any adequate consultation or disclosure regarding the risks, dangers, and plans for

use of such funds.  Essentially and practically, the investment advisers (former defendant John William Beakley, Beakley & Associates and FLP Management, Inc.) acted as the transferor and transferee of any funds, notes, interests.  The Douglasses believe this to be self-dealing. This was enabled as a direct result of the framework they created and caused the Douglasses to invest through.

70.    Upon information and belief, former Defendant John William Beakley, FLP Management, Inc., and Beakley & Associates, P.C. used Douglass funds to provide undisclosed, related-party loans to former Defendant John William Beakley and to other businesses. For instance, Plaintiff Sam Douglass understood from former Defendant John Beakley that he (Sam Douglass) financed the law school education of Defendant Amy Beakley under a "loan" that would pay him back with some nominal amount of interest.  Plaintiff Sam Douglass was fine with that arrangement, and did not expect much return on that transaction, but now it seems that such a loan or any repayment to him therefor is completely unaccounted for.  (See also the Receiver's Report, Dkt. 150, page 18 of 23, Exhibit Q:  "FLP Real Estate Development, Ltd. has outstanding liability to the Douglass partnerships on promissory notes totaling approximately $28,000.")

71.    Additionally, Plaintiff Sam Douglass was advised by former defendant John Beakley on numerous occasions throughout the investing relationship that Sam Douglass' investment money was used to purchase residential houses in places in this State and rented to third parties.  Those houses appear to have been sold or transferred at some point to someone else, and that money is apparently unaccounted for.  Upon information and belief, one of such houses was in Cash,

Texas; another was in Lubbock, Texas. Upon information and belief, the house in Lubbock, Texas was located at: 3212 Bates St., Lubbock, TX. Upon information and belief, the legal description of the house in Cash, Texas is as follows:

| 50721 | 3955-0000-0090-40 | Real | S3955 MARTIN'S SECOND ADDITION LOT 9 | $64,950 | View Details |
| 50722 | 3955-0000-0100-40 | Real | MARTIN ACRES ADDITION #2, LOT 10 | $4,340 | |

72. Plaintiff Sam Douglass also understood from representations by former defendant John Beakley during the course of the investment management that he (Plaintiff Sam Douglass) actually owned the real property located at 6102 Chicago Avenue in Lubbock, Texas, and now he realizes, since the filing of this case, that it was sold at some point unbeknownst to him. (See, e.g., Receiver's Report, Dkt 150, page 5 of 23, such copy also attached hereto as Exhibit Q, "Diversified Real Estate, LLC, the owner of the premises leased by Beakley & Associates, filed its Motion for Relief.")

73. Furthermore, upon information and belief, in addition to the income identified herein, former Defendant John William Beakley and Defendant Mary Jan Beakley appear to derive "rental reimbursements" for at least some of their residences and properties, which are apparently, at times, charged to their various entities, at least some of which, upon information and belief, are owned by the Douglasses. See Exhibit A to this complaint, for instance, which provides for the income and sources of some of the funds received by former Defendant John William Beakley and Defendant Mary Jan Beakley through these entities (excerpt below) – note the "St. Thomas, USVI residence rentals/reimbursements" of

$40,500 that year alone and the "Lubbock, Texas residence rental/reimbursements" of $25,575 that year alone. Again, this is over $65,000 paid in one year alone such that the entities involved in this case, some or more owned by the Douglasses, upon information and belief, were effectively paying at least a couple the Defendant Mary Jan Beakleys' mortgages (Exhibit A):

| INCOME | |
|---|---:|
| Guarantor fee (1%) - Roundtable Corporation | $ 150,000 |
| Guarantor fee (1%) - DQ Real Estate Development, Ltd. | 10,000 |
| Mileage reimbursement (net of payment) - Beakley & Associates, P.C. | 11,400 |
| Non-taxable fringe benefits (medical) - Commerce Resource Group, Inc. | 7,500 |
| Salary - Commerce Resource Group, Inc./Beakley & Associates, P.C. | 26,000 |
| Royalty income (client/contact base) - BGA Design & Development, Ltd. | 90,000 |
| St. Thomas, USVI residence rentals/reimbursements | 40,500 |
| Lubbock, Texas residence rental/reimbursements | 25,575 |
| Partnership income/distributions | 136,000 |
| Vehicle leases - Roundtable Corporation, et.al. | 91,200 |
| Total Income | $ 588,175 |

74.     While the true location of the Plaintiff's funds is not known at this time, former Defendant John William Beakley (and FLP Management, Inc. and Beakley & Associates, P.C.) has/have admitted that at least some of these funds from each of the Plaintiffs were invested in and through the Entity Defendants. (See Exhibit D and Exhibit E, the "Master Account Spreadsheet"). It is believed that there are more entities that directly received funds from the Douglasses either to start or maintain them; thus the John Does in this complaint.

75.     Former Defendant John William Beakley (and FLP Management, Inc., Beakley & Associates, P.C., and the other Entity Defendants acting by and through former Defendant John William Beakley) has/have sent a number of fraudulent emails, at a minimum. The Douglasses relied upon each of these

transmissions, they were material, they were fraudulent, and they were knowingly sent with the intent to defraud the Douglasses.  Some are more specifically detailed below.

**B.**     **June 3, 2009 Email**

76.     On June 3, 2009, former Defendant John William Beakley emailed Plaintiff Timothy Douglass and informed him that he would be "motivated to do more for" himself without "the invested funds and access to the earnings they are generating." He also told him that "[t]he current market for tax free rates of return is about 3.5%, so we are significantly higher than that at about a 6.5% tax free rate of return on your invested funds. When we started this process I thought we could maintain about a 5% tax free rate of return. Your current distributions would be the equivalent of earning about $90,000 per year, if you were earning that as a salary." See Exhibit G.

77.     These statements were made by former defendant John Beakley in his capacity as partner, officer, authorized agent, vice-principal, and employee, as applicable, acting with fully authority of each of the Entity Defendants to which Douglass funds were invested or managed by in this case.  As such, this email is their email.

78.     Notably, Plaintiff Timothy Douglass' investments were "lumped together" in this analysis, which seems to have been the preferred method of advising concerning the value of the Plaintiffs' investments, even though the investments were allegedly in and through the specific entities named herein.  At a rate of return of 6.5% (tax-free) over 8 years as represented, Plaintiff Timothy Douglass

(and each of the Douglasses) should have been worth $4,137,489 at the time of this email (for a collective value for all of the Plaintiffs of greater than $16.5 Million). This was a false and misleading statement, and it was materially so, as the rates of return were, based on current information, seldom if ever more than negative once invested in entities (including the Entity Defendants) owned and/or controlled by former Defendant John William Beakley (assuming they were invested at the amounts indicated, as well). On information and belief, they are now worth zero or negative. It was intentional, as a correct valuation would have resulted in an immediate demand for return of capital, an immediate demand to stop investing the Douglasses' money, and possible litigation. Former defendant John William Beakley, and the entities for which he acted, knew this; that was the reason to mislead with high rates of return. Former defendant John William Beakley, and the entities for which he acted, could not afford to have a demand for return of the capital or any investigation into the source or status of Douglass funds. Any reasonable, normal person would consider this highly-material, as did the Douglasses. Former defendant John William Beakley, and the entities that he acted on behalf of (including the Entity Defendants herein), knew that value in these entities was substantially smaller than represented at the time of this transmission. It had to be, as these interests could not be worth $16.5 Million in the fall of 2009 and now be worth zero or negative. Former Defendant John Beakley and the entities he acted on behalf of, knew these statements were material and misleading as it is impossible for the principle and agent of the invested entity, the recipient of funds, and the investment advisor (all in one

mind) not to know what the true state of the investments was.

79.     Upon information and belief, at all times former defendant John William Beakley was charging at least some of these entities large "fees" of various types, including accounting fees, guarantor fees, professional fees, management fees, fringe benefits, vehicle lease reimbursements in excess of expenditures, etc. Some of these were being paid to family members, as well, thus the unjust enrichment claims alleged against same herein.  These were also not disclosed to the Douglasses in this transmission.  See Exhibit A to this complaint, for instance, which provides for the income and sources of some of the funds received by former Defendant John William Beakley and Defendant Mary Jan Beakley through these entities (excerpt below):

| INCOME | | |
|---|---|---|
| Guarantor fee (1%) - Roundtable Corporation | | $ 150,000 |
| Guarantor fee (1%) - DQ Real Estate Development, Ltd. | | 10,000 |
| Mileage reimbursement (net of payment) - Beakley & Associates, P.C. | | 11,400 |
| Non-taxable fringe benefits (medical) - Commerce Resource Group, Inc. | | 7,500 |
| Salary - Commerce Resource Group, Inc./Beakley & Associates, P.C. | | 26,000 |
| Royalty income (client/contact base) - BGA Design & Development, Ltd. | | 90,000 |
| St. Thomas, USVI residence rentals/reimbursements | | 40,500 |
| Lubbock, Texas residence rental/reimbursements | | 25,575 |
| Partnership income/distributions | | 136,000 |
| Vehicle leases - Roundtable Corporation, et.al. | | 91,200 |
| | Total Income | $ 588,175 |

80.     Upon information and belief, the fees described herein (and others, such as accounting fees– see Exhibit N, for instance – showing accounting fees charged to former defendant Roundtable Corporation approximately $138,540.98 for the mere period from October, 2009 – September, 2010) were being paid at the time of this transmission, and they were not disclosed in this transmission.  They were

intentionally not disclosed (or, upon information and belief, not disclosed sufficiently such that the Douglasses understood what was effectively happening here) as doing so would have resulted in an immediate demand for return of capital, an immediate demand to stop investing the Douglasses' money, and possible litigation. In other words, to a non-sophisticated investor, these might not trigger an alarm, but for an investment adviser to be charging these fees and additional investment adviser fees is unreasonable. And despite the lack of disclosure to the Douglasses, the fees were too great and unfair. It was highly, highly material as the Douglasses' decision to continue to permit their investment advisers to manage and control their largest single investment was based on the belief that their money was relatively safe and growing; that the investments were working; and that there was no self-dealing. But to former defendant John William Beakley and the entities for whom he acted, Plaintiffs' money was necessary to further the continuing enterprise of these entities (including the Entity Defendants); he could not afford to have to return it or have any investigation into what exactly was transpiring – so instead he, acting in his representative capacities, materially and intentionally misrepresented the value of the investments and the illusory "return on investment".

81.    Upon information and belief, the tax fraud complained of herein was occurring or was contemplated to occur at the time of this transmission, and it was not disclosed in this specific transmission. For example, in merely one of the pages of Exhibit F, this one concerning Defendant Mama Mia's Pizza Kitchen, Ltd., defendant herein, the tax problems appear to have started occurring at least

as early as the tax period ending December 31, 2008:



82.    In addition, in merely one of the pages of Exhibit F, this one concerning Defendant I-27 Marine & RV Ltd., defendant herein, the tax problems appear to have started occurring at least as early as the tax period ending December 31, 2007:



83.    In addition, in merely one of the pages of Exhibit F, this one concerning

Defendant I-27 Powersports, Inc., defendant herein, the tax problems appear to
have started occurring at least as early as the tax period ending March 31, 2009:



84.    In addition, in merely one of the pages of Exhibit F, this one concerning
former defendant RCDQ Clinton, Inc. (understood to be a wholly owned
subsidiary or similar to former defendant Roundtable Corporation), the tax
problems appear to have started occurring at least as early as the tax period ending
December 31, 2007:



85.    Exhibit F has additional examples of these types of issues.    On information and belief, the tax problems were intentionally not disclosed as doing so would have resulted in an immediate demand for return of capital, an immediate demand to stop investing the Douglasses' money, and possible litigation.  It was highly, highly material as the Douglasses' decision to continue to permit their investment advisers to manage and control their single greatest asset was based on the belief that their money was relatively safe and growing; that the investments were working; and that the operation was being operated lawfully.  Additionally, tax fraud and non-compliance would result in complete destruction of any value, as may have happened in this case, ultimately, and at its culmination, it results in Department of Treasury levies, which also happened in this case.  But to former defendant John William Beakley and the entities for whom he acted, upon information and belief, Plaintiffs' money was necessary to further the continuing enterprise of these entities (including the Entity Defendants).  Upon information and belief, he could not afford to have to return it – so instead he, acting in his representative capacities, materially and intentionally

misrepresented the value of the investments and omitted the looming, material problems described above. Each of the Douglasses extensively relied upon these misstatements and omissions, as at a minimum, they felt at ease that their investments were safe; they did not demand the return of their capital; they did not further investigate these issues at a level that they would have had they known how bad the situation actually was; and they did not demand that the entities operate lawfully in terms of tax compliance.

C.    **August 25, 2010 Email and Spreadsheet**

86.    On August 25, 2010, Plaintiff Timothy Douglass emailed former defendant John William Beakley as follows (attached as Exhibit H); note that this email was understood by Plaintiff Timothy Douglass to be sent to former defendant John Beakley in all of his agent and representative capacities on behalf of Defendant Beakley & Associates, P.C., Defendant FLP Management, Inc., and the Entity Defendants through whom the Douglasses invested herein:

*    *    *

As you remember, I was just a young 18yr old pup when we started with you. Ten years later I am just coming into an understanding of what all that means. So, as simply as I understand it, if we invested 2.38 million dollars with you, and you guaranteed an 8.25% percent return annually after tax (which I am understanding to be better than a bank, but still a reasonably cheap debt to a firm such as yours) that return should be roughly $16K a month. While I currently receive 4,900 monthly, I've never seen 8.25%, but 16K is what you're able to get me this month for a down payment on a home for which I am feeling very grateful. So, my question is, is that still the arrangement, and if so, is that return going back into my share of the company, or rather, where is it going?

Like I said, I am sure I am very much oversimplifying it here. Also, my figures don't factor in any compounding growth, they are just rough figures. And I really don't mean to step on any toes. But, I do feel it would be irresponsible of me to not ask since you have told me you don't mind fielding questions. I'm sure you've answered this a billion times before with my father and brother's, but I've never quite gotten a firm grasp on the concept.

87.    In response, on August 25, 2010, former defendant John William Beakley

emailed Plaintiff Timothy Douglass as follows (attached as Exhibit H):

I am sorry that I did not get you called back. I had several clients show up unexpectedly and got caught in several meetings that lasted much longer than I expected. Then I had to review and execute a number of closing documents for DQ property sales that are paying off company debt. I may have an extra Roundtable Corporation pickup that your family could use for free in the short run – not sure, but maybe. I don't know who all is using all of the pickups. *I have attached a copy of the 12/31/08 investment summary that we go over each year.* As soon as all of the tax returns are completed for 2009 I will update this same schedule for 12/31/09. The investment earnings rate that I estimated (not guaranteed) that we could produce at the beginning of this journey was 8.5% before tax and 5.5% after tax. That was based on the then current average returns, when certificates of deposit were paying approximately 5%. You would have to admit that the U.S. is in uncharted territory for the current economy. Mortgage rates at the present levels have not been seen since the 1960s. I think the first mortgage my parents got on the first house they owned was 2.8% in 1965. My point is that current investment returns are in the tank and rates on certificates of deposit are about .50%.

 I think you probably have heard the terms "income" stocks and "growth" stocks. That is where there seems to be a slight disconnect for everyone. Roundtable Corporation has become everyone's (including the Beakley's) largest single investment. However, this is what most people would classify a "growth" stock. Think about Microsoft, Corp. That company has never (even today) paid a dividend, but the stock has become worth a lot per share. The shareholders reap some of the gains in their investment by selling a portion of the stock to other shareholders or back to the company at prices higher than their original investment in the company. As we have discussed in the past, the real estate was done as a hedge against inflation, and because it represented a "tangible" asset rather than publicly traded stocks which are "intangible" assets. *Please review the attached summary and you will see the original funds invested in the various investments and what the 12/31/08 estimated fair market values of those investments was as of that date. Roundtable has increased in value from $1,072,317 to $5,712,867 (estimated for financial statement purposes for all of us) since 2002. However, that is not "cash" or "cash equivalents" – it is increase in the stock value. This gain represents approximately 68% of the total increase in the value of the investments from inception.* We are currently paying the Douglass distributions out of the net cash flow being generated by Roundtable Corporation, but that is not commensurate with the investment growth of the stock.

88.    Former Defendant John William Beakley also enclosed a Microsoft Excel File in his August 25, 2010 email (referenced above) that was titled "Investment Annualized Analysis 123108" that indicated that the Douglasses' investments were worth $14.146 Million (U.S.), and the "Book Value" of such investments of the entities was estimated (by the same person who acted on behalf of these

entities, thus the entities themselves) at $30,124,978.00.  Such spreadsheet is attached as Exhibit E to this Complaint, is incorporated by reference, and is excerpted below:

## Douglass Enterprises - Master Account
### Investment Earnings - Annualized Analysis
### Status as of December 31, 2008

| Description | Initial Invested Capital | Current Capital Balance | Investment Fair Market Value (Estimated) | Total Entity Assets Book Value | Total Entity Equity Book Value (Approximate) | Annualized* Income (Approximate) | Depreciation Amortization | Douglass Monthly Distributions |
|---|---|---|---|---|---|---|---|---|
| Initial Target earnings - non-taxable (5.50%): | 9,433,464 | | | | | 518,841 | | |
| Initial Target earnings - taxable (8.80%): | 9,433,464 | | | | | 607,844 | | |
| Cash & equivalents portfolio: | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | - | | |
| Partnership/Corporate portfolio: | | | | | | | | |
| FLP Real Estate Development, Ltd. - Class A Preferred | 39,094 | 39,094 | 41,831 | 1,219,668 | 186,914 | 938 | 2,366 | - |
| DQ Real Estate Development, Ltd. - 50% limited partnership | 3,544,622 | 3,519,712 | 3,750,000 | 5,286,576 | 269,468 | 259,468 | 47,924 | 330,000 |
| Roundtable Corporation - 200,000 shares common stock (as of fiscal year end September 30, 2008) | 1,072,317 | 1,072,317 | 5,052,000 | 11,714,829 | 4,306,231 | 312,432 | 234,524 | - |
| Concert Management, Ltd. - Class B limited partnership units | 200,000 | 265,694 | 220,000 | 1,540,781 | 444,984 | 233,354 | - | - |
| MP-1 Real Estate Development, Ltd. - 50% limited partnership (from termination of LBC Real Estate Development, Ltd.) | 325,000 | 325,000 | 305,000 | 832,523 | (282,469) | 17,650 | 6,121 | - |
| RH Real Estate Development, Ltd. - Class B limited partnership | 100,000 | 98,250 | 150,000 | 1,966,439 | 150,024 | (35,589) | 28,283 | - |
| Marina Real Estate Development, Ltd. - 50% limited partnership | 295,541 | 38,094 | 305,000 | 412,782 | 210,323 | (4,446) | 11,516 | - |
| I-27 Marine & RV, Ltd. - 50% limited partnership | 1,319,520 | 1,154,983 | 1,125,000 | 2,781,444 | 1,152,567 | (10,043) | 48,465 | - |
| I-27 Powersports, Inc. - 25% common stock (held by I-27 Powersports Investment Group) | 250,000 | 277,297 | 340,750 | 2,986,189 | 1,108,196 | 36,831 | 22,355 | - |
| Tierra de Tejas Development, Ltd. - Class A Preferred Construction Finance Income (25%) | 1,926,370 | 1,951,308 | 2,360,000 | 1,204,902 | 36,213 | (93,907) | 2,404 | - |
| Tierra de Tejas Development, Ltd. - 33% limited partnership | - | - | 250,000 | - | - | 9,354 | - | - |
| Mama Mia Pizza Kitchen, Ltd. - 37.5% limited partnership | 125,000 | (28,080) | 157,500 | 170,441 | 119,987 | (66,845) | 8,812 | - |
| DF-IV Equipment Leasing, Ltd. - Class A Preferred | 235,000 | 7,414 | 98,250 | 7,414 | 7,414 | 18,800 | - | - |
| Totals | 9,433,464 | 8,681,989 | 14,146,331 | 30,124,978 | 9,238,180 | 677,997 | 412,749 | 330,000 |

{EXT/9080/0001/W0913138.5 }

89.    Upon information and belief, these statements were made by former defendant John Beakley in his capacity as investment adviser, partner, officer, authorized agent, vice-principal, and employee, as applicable, acting with fully authority of the Entity Defendants in this case.  As such, this email is their email, and their representations as to the value of the Douglasses investments in each, respectively, are their representations.

90.    Specifically, as the agent for each of these entities, former defendant John W. Beakley spoke with all authority to advise the Douglasses of their worth in each (Excerpt of Exhibit E, below):

**Douglass Enterprises - Master Account**
Investment Earnings - Annualized Analysis
Status as of December 31, 2008

| Description | Initial Invested Capital | Current Capital Balance | Investment Fair Market Value (Estimated) | |
|---|---|---|---|---|
| Initial Target earnings - non-taxable (5.50%): | $    9,433,464 | | | |
| Initial Target earnings - taxable (8.50%): | $    9,433,464 | | | |
| Cash & equivalents portfolio: | $    1,000 | $    1,000 | $    1,000 | $ |
| Partnership/Corporate portfolio: | | | | |
| FLP Real Estate Development, Ltd. - Class A Preferred | $    39,094 | $    39,094 | $    41,831 | $ |
| DQ Real Estate Development, Ltd. - 50% limited partnership | $    3,544,622 | $    3,519,712 | $    3,750,000 | $ |
| Roundtable Corporation - 200,000 shares common stock (as of fiscal year end September 30, 2008) | $    1,072,317 | $    1,072,317 | $    5,052,000 | $ |
| Concert Managment, Ltd. - 50% limited partnership | $    200,000 | $    263,694 | $    220,000 | $ |
| MP-1 Real Estate Development, Ltd. - 50% limited partnership (from termination of LBC Real Estate Development, Ltd.) | $    325,000 | $    325,000 | $    305,000 | $ |
| RH Real Estate Development, Ltd. - Class B limited partnership units | $    100,000 | $    98,250 | $    150,000 | $ |
| Manna Real Estate Development, Ltd. - 50% limited partnership | $    295,541 | | $    305,000 | $ |
| I-27 Marine & RV, Ltd. - 50% limited partnership | $    1,319,520 | $    1,154,983 | $    1,125,000 | $ |
| I-27 Powersports, Inc. - 25% common stock (held by I-27 Powersports Investment Group) | $    250,000 | $    277,297 | $    340,750 | $ |
| Tierra de Tejas Development, Ltd. - Class A Preferred Construction Finance Income (25%) | $    1,926,370 | $    1,951,308 | $    2,350,000 | $ |
| Tierra de Tejas Development, Ltd. - 33% limited partnership | $    - | $    - | $    250,000 | $ |
| Mama Mia Pizza Kitchen, Ltd. - 37.5% limited partnership | $    125,000 | $    (28,080) | $    157,500 | $ |
| DFJV Equipment Leasing, Ltd. - Class A Preferred | $    235,000 | $    7,414 | $    98,250 | $ |
| Totals | $    9,433,464 | $    8,681,989 | $    14,146,331 | $ |

91.    This means that, in addition to former defendant John W. Beakley making

these representations, in addition to Beakley & Associates, P.C. making these representations as an investment advisor, and in addition to FLP Management, Inc. making these representations as an investment advisor (on August 25, 2010; recognizing that the spreadsheet referred to the value allegedly at the end of 2008 – yet also recognizing that the Douglasses were advised as referenced herein that their investments were growing at 5.5% - 6.5% a year – meaning that these were presumably "low" compared to what they were assured to be on August 25, 2010 based on the growth representations; certainly the worth on August 25, 2010 was not represented to have dropped, whatsoever):

    a.   FLP Real Estate Development, Ltd. represented to the Douglasses that the fair market value of their investments in FLP Real Estate Development, Ltd. was $41,831;

    b.   DQ Real Estate Development, Ltd. represented to the Douglasses that the fair market value of their investments in DQ Real Estate Development, Ltd. was $3,750,000;

    c.   RHRE Real Estate Development, Ltd. represented to the Douglasses that the fair market value of their investments in RHRE Real Estate Development, Ltd was $150,000;

    d.   Manna Real Estate Development, Ltd. represented to the Douglasses that the fair market value of their investments in Manna Real Estate Development, Ltd. was $305,000;

e.  I-27 Marine & RV, Ltd. represented to the Douglasses that the fair market value of their investments in I-27 Marine & RV, Ltd. was $1,125,000;

f.  I-27 Powersports, Inc. represented to the Douglasses that the fair market value of their investments in I-27 Powersports, Inc. was $340,750;

g.  Tierra de Tejas Development, Ltd. represented to the Douglasses that the fair market value of their investments in Tierra de Tejas Development, Ltd was $2,600,000; and

h.  Mama Mia Pizza Kitchen, Ltd. represented to the Douglasses that the fair market value of their investments in Mama Mia Pizza Kitchen, Ltd was $157,000.

92.    Additionally, upon information and belief, the general partners of each of these respective entities made such representations (as a limited partnership can practically only act through its general partner, and its general partner would be, upon information and belief, jointly and severally liable for same).

93.    At the indicated targeted rate of return of 5.5% (tax-free) over 7 years as represented, the Douglasses should have been worth $ 13,722,663.83 at the time of this email.  But the spreadsheet attached as Exhibit E showed even more than that – i.e., this was better than target – as the net worth of the initial investments was $14,146,331 as of the date of this spreadsheet (Dec. 31, 2008, although communicated later, on August 25, 2010).  Upon information and belief, this was a false and misleading statement, and it was materially so, as the rates of return

were, based on current information, seldom if ever more than negative once invested in these entities.  It had to be, as these interests could not be worth what they were represented to be at this point in time and now worth zero or negative. This email was sent approximately 18 months prior to the United States Department of Treasury/Internal Revenue Service beginning its levies apparently based on back-taxes owed for periods long prior.[2]  Upon information and belief, it was intentional, as a correct valuation would have resulted in an immediate demand for return of capital, an immediate demand to stop purchasing and selling securities on the Douglasses' behalf, an immediate demand to stop investing the Douglasses money, and possible litigation.  Upon information and belief, former defendant John William Beakley and the defendants in whom the Douglasses invested knew this; that was the reason to suggest high rates of return.  They could not afford to have a demand for return of the capital.  Any reasonable, normal person would consider this highly-material, as did the Douglasses.  Upon information and belief, Former defendant John Beakley, and the entities that he acted on behalf of, knew that value in these entities was substantially smaller than represented at the time of this transmission.  Upon information and belief, former Defendant John Beakley, and the entities he acted on behalf of, knew these statements were material and misleading as it is impossible for the principle and agent of the invested entity, the recipient of funds, and the investment adviser (all in one mind) not to know what the true state of the investments was.

---

[2] See Exhibit F.  The IRS/Department of Treasury levies are understood to have happened shortly before the Douglasses original complaint was filed and the Chapter 11 bankruptcies were filed (the Chapter 11

94.    Upon information and belief, at all times former defendant John William Beakley and/or Beakley & Associates, Inc. were charging at least some of these entities large advisory "fees" of various types, including accounting fees, guarantor fees, professional fees, management fees, fringe benefits, vehicle lease reimbursements in excess of expenditures, etc.  Some of these were being paid directly to family members; thus the unjust enrichment claims herein.  These were also not disclosed to the Douglasses in this transmission.  See Exhibit A to this complaint, for instance, which provides for the income and sources of some of the funds received by former Defendant John William Beakley and Defendant Mary Jan Beakley through some of these entities during one calendar year (excerpt below):

| INCOME | |
|---|---|
| Guarantor fee (1%) - Roundtable Corporation | $ 150,000 |
| Guarantor fee (1%) - DQ Real Estate Development, Ltd. | 10,000 |
| Mileage reimbursement (net of payment) - Beakley & Associates, P.C. | 11,400 |
| Non-taxable fringe benefits (medical) - Commerce Resource Group, Inc. | 7,500 |
| Salary - Commerce Resource Group, Inc./Beakley & Associates, P.C. | 26,000 |
| Royalty income (client/contact base) - BGA Design & Development, Ltd. | 90,000 |
| St. Thomas, USVI residence rentals/reimbursements | 40,500 |
| Lubbock, Texas residence rental/reimbursements | 25,575 |
| Partnership income/distributions | 136,000 |
| Vehicle leases - Roundtable Corporation, et.al. | 91,200 |
| Total Income | $ 588,175 |

95.    Upon information and belief, the fees described herein (and others, such as accounting fees– see Exhibit N, for instance – showing accounting fees charged to former defendant Roundtable Corporation approximately $138,540.98 for the mere period from October, 2009 – September, 2010) were being paid at the time of this transmission, and they were not disclosed in this transmission.  They were

---

bankruptcies are understood to be the result of the IRS levies).

intentionally not disclosed as doing so would have resulted in an immediate demand for rescission of the investment advisory agreement, a request for disgorgement of fees, return of capital, an immediate demand to stop buying and selling investments on behalf of the Douglasses, an immediate demand to stop investing the Douglasses' money, and possible litigation. It was highly, highly material as the Douglasses' decision to continue to permit their investment advisers to manage and control their single greatest asset was based on the belief that their money was relatively safe and growing; that the investments were working; and that there was no self-dealing. But to former defendant John William Beakley, Plaintiffs' money was necessary to further the continuing enterprise of these entities; he and they could not afford to have to return it – so instead he and they materially and intentionally misrepresented the value of the investments.

96.     Upon information and belief, the tax fraud complained of herein was occurring or was contemplated to occur at the time of this transmission, and it was not disclosed in this specific transmission. For example, in merely one of the pages of Exhibit F, this one concerning Defendant Mama Mia's Pizza Kitchen, Ltd., defendant herein, the tax problems appear to have started occurring at least as early as the tax period ending December 31, 2008:



97.    In addition, in merely one of the pages of Exhibit F, this one concerning Defendant I-27 Marine & RV Ltd., defendant herein, the tax problems appear to have started occurring at least as early as the tax period ending December 31, 2007:



98.    In addition, in merely one of the pages of Exhibit F, this one concerning

Defendant I-27 Powersports, Inc., defendant herein, the tax problems appear to have started occurring at least as early as the tax period ending March 31, 2009:



99.    In addition, in merely one of the pages of Exhibit F, this one concerning former defendant RCDQ Clinton, Inc. (understood to be a wholly owned subsidiary or similar to former defendant Roundtable Corporation), the tax problems appear to have started occurring at least as early as the tax period ending December 31, 2007:



as Nominee, Transferee and/or Alter-Ego, and Holder of Beneficial Interest of RCDQ Clinton Inc (26-0551905)

Residence
8215 Forest Hills Blvd
Dallas, TX 75218

201100169361
FTL 1/2

06/30/2011 03:39:11 PM

IMPORTANT RELEASE INFORMATION: For each assessment listed below, unless notice of lien is refiled by the date given in column (e), this notice shall, on the day following such date, operate as a certificate of release as defined in IRC 6325(a).

| Kind of Tax (a) | Tax Period Ended (b) | Identifying Number (c) | Date of Assessment (d) | Last Day for Refiling (e) | Unpaid Balance of Assessment (f) |
|---|---|---|---|---|---|
| 941 | 9/30/2009 | 26-0551905 | 12/21/2009 | 1/20/2020 | $2986.75 |
| 941 | 12/31/2009 | 26-0551905 | 3/29/2010 | 4/28/2021 | $8864.96 |
| 940 | 12/31/2009 | 26-0551905 | 6/28/2010 | 7/28/2020 | $371.88 |
| 940 | 12/31/2010 | 26-0551905 | 5/16/2011 | 6/15/2021 | $865.46 |
| 6721 | 12/31/2007 | 26-0551905 | 11/01/2010 | 12/01/2020 | $8393.07 |

100.    Exhibit F has additional examples of these types of issues.    On information and belief, the tax problems were intentionally not disclosed as doing so would have resulted in an immediate demand for return of capital, an immediate demand to stop investing the Douglasses' money, and possible litigation.  It was highly, highly material as the Douglasses' decision to continue to permit their investment advisers to manage and control their single greatest asset was based on the belief that their money was relatively safe and growing; that the investments were working; and that the operation was being operated lawfully.  Additionally, tax fraud and non-compliance would result in complete destruction of any value, as may have happened in this case, ultimately, and at its culmination, it results in Department of Treasury levies, which also happened in this case.  But to former defendant John William Beakley and the entities for whom he acted, upon information and belief, Plaintiffs' money was necessary to further the continuing enterprise of these entities (including the Entity Defendants) and his and his family's lifestyles; he could not afford to have to return it – so instead he materially and intentionally misrepresented the value of

the investments and omitted the looming, material problems described above. Each of the Douglasses extensively relied upon these misstatements and omissions, as at a minimum, they felt at ease that their investments were safe; they did not demand the return of their capital; they did not further investigate these issues at a level that they would have had they known how bad the situation actually was; and they did not demand that the entities operate lawfully in terms of tax compliance.

### D.    September 16, 2010 Letter

101.    Former defendant John William Beakley sent a September 16, 2010 letter (See Exhibit D, emphasis added) that included the following excerpt:

> When this investment process was first proposed in 2001, I believed that a fair rate of return would be ***8.50% before tax and 5.5% on an after tax basis.*** While these rates were both fair and achievable at the time they were proposed (and ***we have achieved these rates so far***), who knows what future rates will be appropriate for a given level of risk?

102.    These statements were made by former defendant John Beakley in his capacity as partner, officer, authorized agent, vice-principal, and employee, as applicable, acting with fully authority of the Entity Defendants to which Douglass funds were invested or managed by herein. As such, this email is their email.

103.    Notably, once again investments were somewhat "lumped together" in this analysis, which seems to have been the preferred method of advising concerning the value of the Plaintiffs' investments, even though the investments were allegedly in and through the specific entities named herein.

104.    As indicated a targeted rate of return of 5.5% (tax-free) over 9 years as

represented, the Douglasses should have been worth just North of $14 Million at the time of this letter. This was a false and misleading statement, and it was materially so, as the rates of return were, based on current information, seldom if ever more than negative once invested in entities owned and/or controlled by former Defendant John William Beakley. This was untrue. The interests were not worth anywhere near this amount as presently understood. They are now worthless or worth negative and were, upon information and belief, not what they were represented to be then.

105.   Upon information and belief, it was intentional, as a correct valuation would have resulted in an immediate demand for return of capital, an immediate demand to stop investing the Douglasses money, and possible litigation.

106.   Upon information and belief, former defendant John William Beakley and the entities for whom he acted knew this; that was the reason to suggest high rates of return. Upon information and belief, former defendant John William Beakley and the entities for whom he acted could not afford to have a demand for return of the capital. Any reasonable, normal person would consider this highly-material, as did the Douglasses.

107.   Upon information and belief, former defendant John Beakley, and the entities that he acted on behalf of, knew that value in these entities was substantially smaller than represented at the time of this transmission.

108.   Upon information and belief, former Defendant John Beakley and the entities he acted on behalf of, knew these statements were material and misleading as it is impossible for the principle and agent of the invested entity, the

recipient of funds, and the investment advisor (all in one mind) not to know what the true state of the investments was.

109.    Upon information and belief, at all times former defendant John William Beakley was charging at least some of these entities large "fees" of various types, including advisory fees, accounting fees, guarantor fees, professional fees, management fees, fringe benefits, vehicle lease reimbursements in excess of expenditures, etc.  Some of these were being paid to family members; thus the unjust enrichment claims herein.  These were also not disclosed to the Douglasses in this transmission.  See Exhibit A to this complaint, for instance, which provides for the income and sources of some of the funds received by former Defendant John William Beakley and Defendant Mary Jan Beakley through these entities (excerpt below):

| INCOME | |
|---|---|
| Guarantor fee (1%) - Roundtable Corporation | $ 150,000 |
| Guarantor fee (1%) - DQ Real Estate Development, Ltd. | 10,000 |
| Mileage reimbursement (net of payment) - Beakley & Associates, P.C. | 11,400 |
| Non-taxable fringe benefits (medical) - Commerce Resource Group, Inc. | 7,500 |
| Salary - Commerce Resource Group, Inc./Beakley & Associates, P.C. | 26,000 |
| Royalty income (client/contact base) - BGA Design & Development, Ltd. | 90,000 |
| St. Thomas, USVI residence rentals/reimbursements | 40,500 |
| Lubbock, Texas residence rental/reimbursements | 25,575 |
| Partnership income/distributions | 136,000 |
| Vehicle leases - Roundtable Corporation, et.al. | 91,200 |
| Total Income | $ 588,175 |

110.    Upon information and belief, the fees described herein (and others, such as accounting fees – see Exhibit N, for instance – showing accounting fees charged to former defendant Roundtable Corporation approximately $138,540.98 for the mere period from October, 2009 – September, 2010) were being paid at the time

of this transmission, and they were not disclosed in this transmission.

111.   Upon information and belief, they were intentionally not disclosed as doing so would have resulted in an immediate demand for return of capital, an immediate demand to stop investing the Douglasses' money, an immediate demand to stop offering and selling securities on the Douglasses behalf, an immediate demand to cease being investment advisers, and possible litigation. It was highly, highly material as the Douglasses' decision to continue the investment arrangement was based on the belief that their money was growing; that the investments were working; and that there was no self-dealing occurring like this. But to former defendant John William Beakley, Plaintiffs money was necessary to further the continuing enterprise of these entities; he could not afford to have to return it – so instead he materially and intentionally misrepresented the value of the investments.

112.   Upon information and belief, the tax fraud complained of herein was occurring or was contemplated to occur at the time of this transmission, and it was not disclosed in this specific transmission. For example, in merely one of the pages of Exhibit F, this one concerning Defendant Mama Mia's Pizza Kitchen, Ltd., defendant herein, the tax problems appear to have started occurring at least as early as the tax period ending December 31, 2008:



113.    In addition, in merely one of the pages of Exhibit F, this one concerning

Defendant I-27 Marine & RV Ltd., defendant herein, the tax problems appear to

have started occurring at least as early as the tax period ending December 31,

2007:



114.    In addition, in merely one of the pages of Exhibit F, this one concerning

Defendant I-27 Powersports, Inc., defendant herein, the tax problems appear to

have started occurring at least as early as the tax period ending March 31, 2009:



115.   In addition, in merely one of the pages of Exhibit F, this one concerning former defendant RCDQ Clinton, Inc. (understood to be a wholly owned subsidiary or similar to former defendant Roundtable Corporation), the tax problems appear to have started occurring at least as early as the tax period ending December 31, 2007:



116.    Exhibit F has additional examples of these types of issues.  On information and belief, the tax problems were intentionally not disclosed as doing so would have resulted in an immediate demand for return of capital, an immediate demand to stop investing the Douglasses' money, and possible litigation.  It was highly, highly material as the Douglasses' decision to continue to permit their investment advisers to manage and control their single greatest asset was based on the belief that their money was relatively safe and growing; that the investments were working; and that the operation was being operated lawfully.

117.    Additionally, tax fraud and non-compliance would result in complete destruction of any value, as may have happened in this case, ultimately, and at its culmination, it results in Department of Treasury levies, which also happened in this case.  But to former defendant John William Beakley and the entities for whom he acted, upon information and belief, Plaintiffs' money was necessary to further the continuing enterprise of these entities (including the Entity Defendants).  Upon information and belief, he could not afford to have to return it – so instead he, acting in his representative capacities, materially and intentionally misrepresented the value of the investments and omitted the looming, material problems described above.

118.    Each of the Douglasses extensively relied upon these misstatements and omissions, as at a minimum, they felt at ease that their investments were safe; they did not demand the return of their capital; they did not further investigate these issues at a level that they would have had they

known how bad the situation actually was; and they did not demand that the entities operate lawfully in terms of tax compliance.

**E.**    **January 7, 2011 Email**

119.    On December 23, 2010, Plaintiff Sam Douglass met with former defendant John William Beakley and asked how the Plaintiffs could be "bought out" completely from whatever former defendant John William Beakley had arranged for them. On January 7, 2011, Plaintiff Sam Douglass emailed former defendant John William Beakley and confirmed same, indicating that this was " a 'front burner' topic of conversation in the Douglass family I/we will be glad to adjust our schedules to meet with you and any other parties to make it a reality in 2011. The sooner the better." Exhibit I. On January 7, 2011, former defendant John William Beakley emailed Plaintiff Sam Douglass and indicated (Exhibit I):

I have known for a long time that the boys want to sell out and do their own things with the cash. This sounds like you are also interested in that possibility. Is that true and what is driving the sudden rush to get it done? 2011 is a whole year and a lot of things have to fall into place for this possibility to become a reality. I believe that we are beginning to see a number of those things fall into place, but they are not in place yet – still working on them. ***The ESOP can purchase the shares, but we have to be able to accumulate some cash for a down payment and then the boys will probably have to carry some of the paper if they want to sell all of their stock***. Please let me know what you are thinking.

120.    These statements were made by former defendant John Beakley in his capacity as partner, officer, authorized agent, vice-principal, and employee, as applicable, acting with fully authority of the Entity Defendants who either managed the Douglasses' investments or of whom the Douglasses were invested in herein. As such, this email is their email.

121.    The Douglasses were beginning to have concerns in 2011 about the status of their investments.  Upon information and belief, instead of coming clean about

the true state of the financial condition of these entities – the Douglasses were lulled to wait just a little longer to "see a number of those things fall into place."

122.    Upon information and belief, former defendant John William Beakley and the entities for which he acted knew the Douglasses wanted to get their money out, and instead of attempting to solve that problem, they tried to coax the Douglasses into waiting to do anything.  Upon information and belief, as actually happened in this case, the truth was that there was a coming storm, and all were headed right into the eye; except the Douglasses had no idea the storm was coming. Waiting made it worse, upon information and belief, and yet they were advised to do so.  They were still of the understanding that they were worth somewhere around $12- $14 Million, as repeatedly re-assured, in and through these emails and as late as the Summer of 2011 during Mr. Sam Douglass' conversations with former defendant John William Beakley, yet, upon information and belief, that was not true.  Telling the Douglasses about the true state of things, the true value of their investments, the terrible accounting and tax troubles, or otherwise warning them whatsoever, would have caused the Douglasses to take action, blow the whistle, immediately demand a return of capital, which would have ruined any remaining chance in the mind of the Defendants advising the Douglasses and through whom they had invested.

123.    Upon information and belief, at all times former defendant John William Beakley was charging each of these entities large "fees" of various types, including accounting fees, guarantor fees, professional fees, management fees, fringe benefits, vehicle lease reimbursements in excess of expenditures, etc.

Some of these were being paid to family members, thus the unjust enrichment claims herein.   These were also not disclosed to the Douglasses in this transmission.  See Exhibit A to this complaint, for instance, which provides for the income and sources of some of the funds received by former Defendant John William Beakley and Defendant Mary Jan Beakley through these entities (excerpt below):

| INCOME | |
|---|---|
| Guarantor fee (1%) - Roundtable Corporation | $ 150,000 |
| Guarantor fee (1%) - DQ Real Estate Development, Ltd. | 10,000 |
| Mileage reimbursement (net of payment) - Beakley & Associates, P.C. | 11,400 |
| Non-taxable fringe benefits (medical) - Commerce Resource Group, Inc. | 7,500 |
| Salary - Commerce Resource Group, Inc./Beakley & Associates, P.C. | 26,000 |
| Royalty income (client/contact base) - BGA Design & Development, Ltd. | 90,000 |
| St. Thomas, USVI residence rentals/reimbursements | 40,500 |
| Lubbock, Texas residence rental/reimbursements | 25,575 |
| Partnership income/distributions | 136,000 |
| Vehicle leases - Roundtable Corporation, et.al. | 91,200 |
| Total Income | $ 588,175 |

124.   Upon information and belief, the fees described herein (and others, such as accounting fees– see Exhibit N, for instance – showing accounting fees charged to former defendant Roundtable Corporation approximately $138,540.98 for the mere period from October, 2009 – September, 2010) were being paid at the time of this transmission, and they were not disclosed in this transmission.  They were intentionally not disclosed as doing so would have resulted in an immediate demand for return of capital, an immediate demand to stop investing the Douglasses' money, an immediate demand to stop offering and selling investments on the Douglasses behalf, an immediate demand to cease being investment advisers, and possible litigation.  It was highly, highly material as the

Douglasses' decision to continue the investment arrangement with these Defendants was based on the belief that their money was growing; that the investments were working; and that there was no self-dealing occurring like this. But to the defendants who managed the Douglasses investments and to the defendants who received the Douglasses money as investors, upon information and belief, the Douglasses money was necessary to further the continuing enterprise of these defendants; they could not afford to have to return it – so instead they materially and intentionally acted as if good would come if the Douglasses would merely wait.

125.   Upon information and belief, the tax fraud complained of herein was occurring or was contemplated to occur at the time of this transmission, and it was not disclosed in this specific transmission.  For example, in merely one of the pages of Exhibit F, this one concerning Defendant Mama Mia's Pizza Kitchen, Ltd., defendant herein, the tax problems appear to have started occurring at least as early as the tax period ending December 31, 2008:

126.    In addition, in merely one of the pages of Exhibit F, this one concerning Defendant I-27 Marine & RV Ltd., defendant herein, the tax problems appear to have started occurring at least as early as the tax period ending December 31, 2007:



| Kind of Tax (a) | Tax Period Ended (b) | Identifying Number (c) | Date of Assessment (d) | Last Day for Refiling (e) | Unpaid Balance of Assessment (f) |
|---|---|---|---|---|---|
| 6721 | 12/31/2007 | 20-3471051 | 9/06/2010 | 10/06/2020 | $10429.38 |
| 941 | 6/30/2009 | 20-3471051 | 9/14/2009 | 10/14/2019 | $2730.65 |
| 941 | 9/30/2009 | 20-3471051 | 12/21/2009 | 1/20/2020 | $1689.29 |
| 941 | 12/31/2009 | 20-3471051 | 3/29/2010 | 4/28/2020 | $11663.93 |
| 941 | 6/30/2010 | 20-3471051 | 10/04/2010 | 11/03/2020 | $2588.12 |
| 941 | 12/31/2010 | 20-3471051 | 4/04/2011 | 5/04/2021 | $20571.57 |
| 940 | 12/31/2009 | 20-3471051 | 5/10/2010 | 6/09/2020 | $492.53 |

127.    In addition, in merely one of the pages of Exhibit F, this one concerning Defendant I-27 Powersports, Inc., defendant herein, the tax problems appear to have started occurring at least as early as the tax period ending March 31, 2009:



128.   In addition, in merely one of the pages of Exhibit F, this one concerning former defendant RCDQ Clinton, Inc. (understood to be a wholly owned subsidiary or similar to former defendant Roundtable Corporation), the tax problems appear to have started occurring at least as early as the tax period ending December 31, 2007:



129.   Exhibit F has additional examples of these types of issues.   On

information and belief, the tax problems were intentionally not disclosed as doing so would have resulted in an immediate demand for return of capital, an immediate demand to stop investing the Douglasses' money, and possible litigation.  It was highly, highly material as the Douglasses' decision to continue to permit their investment advisers to manage and control their single greatest asset was based on the belief that their money was relatively safe and growing; that the investments were working; and that the operation was being operated lawfully.  Additionally, tax fraud and non-compliance would result in complete destruction of any value, as may have happened in this case, ultimately, and at its culmination, it results in Department of Treasury levies, which also happened in this case.  But to former defendant John William Beakley and the entities for whom he acted, upon information and belief, Plaintiffs' money was necessary to further the continuing enterprise of these entities (including the Entity Defendants).  Upon information and belief, he could not afford to have to return it – so instead he materially and intentionally misrepresented the value of the investments and omitted the looming, material problems described above.

130.    Furthermore, there was no disclosure herein of the tremendous accounting difficulties, comingling, and entity funding by former Defendant Roundtable Corporation.  Rather, the material representation was essentially that all was well and that the Douglasses just needed to wait until a few things fall into place.  Upon information and belief, this was intentionally not disclosed for the same reasons herein – if the Douglasses knew, they might demand their money back; they might blow the whistle; they might seek litigation; they might do something

that the Defendants managing the Douglasses' investments and through whom the Douglasses invested herein would not like. So, upon information and belief, those defendants felt it was better that they stay uninformed. The Douglasses relied on these representations and omissions to their detriment and damage, as waiting has served only to minimize any possible recovery.

**F.    Summer 2011 Telephone Conversations**

131.    On or about June 16, 2011, Sam Douglass had two telephone conversations totaling approximately 2 hours in length with former defendant John William Beakley. During the course of one of these two conversations, former defendant John William Beakley, acting in his representative capacities as described herein, indicated to Plaintiff Sam Douglass that a conservative estimate of the Douglasses assets exceeded $14 Million (U.S.). On the other, he indicated that it was at least $12 Million.

132.    Former defendant John William Beakley also indicated for the very first time during at least one of these two telephone conversations that he decided to "borrow" from the U.S. Internal Revenue Service (IRS), the franchisor (American Dairy Queen) and various other entities/persons who allegedly owned the real property upon which the former defendant RCDQ entities franchises were located.

133.    As to that last sentence, at some point DQ Real Estate Development, Ltd. (understood to be the purchaser of real property on whom restaurants were situated, Defendant herein and entity in which the Douglasses were invested) began selling these real properties through "sale/leaseback" arrangements to third

parties for money to, upon information and belief, finance the troubled enterprises. The Douglasses were not adequately advised about these arrangements, as essentially, any security in their investments into DQ Real Estate Development, Ltd. was transferred for cash to various third-party landlords. Upon information and belief, these were not disclosed in each of the specific transmissions identified herein. These are referenced, in part, through Exhibits J and Exhibit K attached hereto.

134.    Former defendant John William Beakley, in his representative capacity, further indicated that these "loans" or "borrowing" were in the form of slow paid lease payments; slow paid franchise fees and a recent cessation of remittances for IRS payroll taxes on some, or all, of the 85 Dairy Queen franchises.

135.    Former defendant John William Beakley, in his representative capacities, assured Sam Douglass that these "loans" or "borrowing" and other efforts were routine, acceptable accounting maneuvers to address short term cash flow problems created by a cold winter. Former defendant John William Beakley then described the discussion with the supervisor wherein the IRS employee "apologized" to him for making such an issue over such a small amount of owed taxes (described to be approximately $800,000.00) and that former defendant John William Beakley had assured the IRS supervisor that he understood the premium that would need to be paid for borrowing from the IRS and that the IRS should not be concerned.

136.    These statements were made by former defendant John Beakley in his capacity as partner, officer, authorized agent, vice-principal, and employee, as

applicable, acting with fully authority of the Defendant Entities that managed the Douglasses investments and through which they were invested, as applicable (to those who owed back taxes, for instance).. As such, this conversation is their conversation.

137.    The Douglasses were beginning to have concerns in 2011 about the status of their investments, and, upon information and belief, these entities through which the Douglasses invested and which managed the Douglasses investments realized it, upon information and belief.  Instead of coming clean about the true state of the financial condition of these entities the Douglasses were again lulled to wait just a little longer. This continued into the summer of 2011 through these conversations.  Former defendant John William Beakley and the defendants for whom he acted knew the Douglasses wanted to get capital out, and instead of attempting to solve that problem, upon information and belief, they tried to bury it through these conversations.  The truth was that there was a coming storm, and all were headed right into the eye; except the Douglasses had no idea the storm was coming. They were still of the understanding that they were worth approximately $12 to $14 Million, as repeatedly re-assured, yet that was apparently not true. Upon information and belief, telling the Douglasses about the true state of things, or otherwise warning them, would have caused the Douglasses to take action, blow the whistle, immediately demand a return of capital, which would have ruined any remaining chance of avoiding collapse (in the eyes of the defendants managing the Douglasses investments or through which they had invested).

138.    Upon information and belief, at all times former defendant John William

Beakley was charging each of these entities large "fees" of various types, including accounting fees, guarantor fees, professional fees, management fees, fringe benefits, vehicle lease reimbursements in excess of expenditures, etc. Some of these were being paid to family members, thus the unjust enrichment claims herein. These were also not disclosed to the Douglasses in these conversations. See Exhibit A to this complaint, for instance, which provides for the income and sources of some of the funds received by former Defendant John William Beakley and Defendant Mary Jan Beakley through these entities for approximately one year (excerpt below):

| INCOME | |
|---|---|
| Guarantor fee (1%) - Roundtable Corporation | $ 150,000 |
| Guarantor fee (1%) - DQ Real Estate Development, Ltd. | 10,000 |
| Mileage reimbursement (net of payment) - Beakley & Associates, P.C. | 11,400 |
| Non-taxable fringe benefits (medical) - Commerce Resource Group, Inc. | 7,500 |
| Salary - Commerce Resource Group, Inc./Beakley & Associates, P.C. | 26,000 |
| Royalty income (client/contact base) - BGA Design & Development, Ltd. | 90,000 |
| St. Thomas, USVI residence rentals/reimbursements | 40,500 |
| Lubbock, Texas residence rental/reimbursements | 25,575 |
| Partnership income/distributions | 136,000 |
| Vehicle leases - Roundtable Corporation, et.al. | 91,200 |
| Total Income | $ 588,175 |

139.    Upon information and belief, the fees described herein (and others, such as accounting fees– see Exhibit N, for instance – showing accounting fees charged to former defendant Roundtable Corporation approximately $138,540.98 for the mere period from October, 2009 – September, 2010) were being paid at the time of this transmission, and they were not disclosed in this transmission. Upon information and belief, they were intentionally not disclosed as doing so would have resulted in an immediate demand for return of capital, an immediate demand

to stop investing the Douglasses' money, an immediate demand to stop offering and selling securities on the Douglasses behalf, an immediate demand to cease being investment advisers, and possible litigation.  It was highly, highly material as the Douglasses' decision to continue the investment arrangement was based on the belief that their money was growing; that the investments were working; and that there was no self-dealing occurring like this.  But to the defendants through which the Douglasses were invested or who managed the Douglasses investments, upon information and belief, the Douglasses' money was necessary to further the continuing enterprise of these entities; they could not afford to have to return it – so instead they materially and intentionally misrepresented the value of the investments and encouraged the Douglasses to wait.

140.    Upon information and belief, the tax fraud complained of herein was occurring or was contemplated to occur at the time of this transmission, and it was not disclosed in this specific transmission.  For example, in merely one of the pages of Exhibit F, this one concerning Defendant Mama Mia's Pizza Kitchen, Ltd., defendant herein, the tax problems appear to have started occurring at least as early as the tax period ending December 31, 2008:



Name of Taxpayer
John W. Beakley Jr. (XXX-XX-0589) General Partner
Mama Mia Pizza Kitchen LTD (20-3365594)

Residence
8215 Forest Hills Blvd
Dallas, TX 75218

IMPORTANT RELEASE INFORMATION: For each assessment listed below, unless notice of lien is refiled by the date given in column (e), this notice shall, on the day following such date, operate as a certificate of release as defined in IRC 6325(a).

| Kind of Tax (a) | Tax Period Ended (b) | Identifying Number (c) | Date of Assessment (d) | Last Day for Refiling (e) | Unpaid Balance of Assessment (f) |
|---|---|---|---|---|---|
| 941 | 12/31/2008 | 20-3365594 | 3/23/2009 | 4/22/2019 | $10039.36 |
| 941 | 3/31/2009 | 20-3365594 | 7/06/2009 | 8/05/2019 | $10214.19 |
| 941 | 6/30/2009 | 20-3365594 | 9/21/2009 | 10/21/2019 | $10088.00 |
| 941 | 9/30/2009 | 20-3365594 | 12/28/2009 | 1/27/2020 | $8743.11 |
| 941 | 12/31/2009 | 20-3365594 | 4/05/2010 | 5/05/2020 | $10003.74 |
| 941 | 3/31/2010 | 20-3365594 | 7/05/2010 | 8/04/2020 | $1387.80 |

141.    In addition, in merely one of the pages of Exhibit F, this one concerning Defendant I-27 Marine & RV Ltd., defendant herein, the tax problems appear to have started occurring at least as early as the tax period ending December 31, 2007:



these taxes, and additional penalties, interest, and costs that may accrue.

Name of Taxpayer
John W. Beakley Jr. (XXX-XX-0589) General Partner
I-27 Marine & RV LTD (20-3471051)

Residence
8215 Forest Hills Blvd
Dallas, TX 75218

IMPORTANT RELEASE INFORMATION: For each assessment listed below, unless notice of lien is refiled by the date given in column (e), this notice shall, on the day following such date, operate as a certificate of release as defined in IRC 6325(a).

| Kind of Tax (a) | Tax Period Ended (b) | Identifying Number (c) | Date of Assessment (d) | Last Day for Refiling (e) | Unpaid Balance of Assessment (f) |
|---|---|---|---|---|---|
| 6721 | 12/31/2007 | 20-3471051 | 9/06/2010 | 10/06/2020 | $10429.38 |
| 941 | 6/30/2009 | 20-3471051 | 9/14/2009 | 10/14/2019 | $2730.65 |
| 941 | 9/30/2009 | 20-3471051 | 12/21/2009 | 1/20/2020 | $1689.29 |
| 941 | 12/31/2009 | 20-3471051 | 3/29/2010 | 4/28/2020 | $11663.93 |
| 941 | 6/30/2010 | 20-3471051 | 10/04/2010 | 11/03/2020 | $2588.12 |
| 941 | 12/31/2010 | 20-3471051 | 4/04/2011 | 5/04/2021 | $20571.57 |
| 940 | 12/31/2009 | 20-3471051 | 5/10/2010 | 6/09/2020 | $492.53 |

142.    In addition, in merely one of the pages of Exhibit F, this one concerning Defendant I-27 Powersports, Inc., defendant herein, the tax problems appear to have started occurring at least as early as the tax period ending March 31, 2009:



143.    In addition, in merely one of the pages of Exhibit F, this one concerning former defendant RCDQ Clinton, Inc. (understood to be a wholly owned subsidiary or similar to former defendant Roundtable Corporation), the tax problems appear to have started occurring at least as early as the tax period ending December 31, 2007:



144.    Exhibit F has additional examples of these types of issues.    On

information and belief, the tax problems were intentionally not disclosed as doing so would have resulted in an immediate demand for return of capital, an immediate demand to stop investing the Douglasses' money, and possible litigation.  It was highly, highly material as the Douglasses' decision to continue to permit their investment advisers to manage and control their single greatest asset was based on the belief that their money was relatively safe and growing; that the investments were working; and that the operation was being operated lawfully.  Additionally, tax fraud and non-compliance would result in complete destruction of any value, as may have happened in this case, ultimately, and at its culmination, it results in Department of Treasury levies, which also happened in this case.  But to former defendant John William Beakley and the entities for whom he acted, upon information and belief, Plaintiffs' money was necessary to further the continuing enterprise of these entities (including the Entity Defendants).  Upon information and belief, he could not afford to have to return it – so instead he materially and intentionally misrepresented the value of the investments and omitted the looming, material problems described above.

145.    Furthermore, there was no disclosure herein of the tremendous accounting difficulties, comingling, and entity funding by former Defendant Roundtable Corporation.  Rather, the material representation was that all was well and that more time was needed.  Upon information and belief, this was intentionally done, and items not disclosed, for the same reasons herein – if the Douglasses knew, they might demand their money back; they might blow the whistle; they might seek litigation; they might do something that the Defendants herein would not

like. So, upon information and belief, it was better that they stay uninformed. The Douglasses relied on these representations and omissions to their detriment. Each of the Douglasses extensively relied upon these misstatements and omissions, as at a minimum, they felt at ease that their investments were safe; they did not demand the return of their capital; they did not further investigate these issues at a level that they would have had they known how bad the situation actually was; and they did not demand that the entities operate lawfully in terms of tax compliance.

G.    **Intention to Deceive**

146.    Upon information and belief, all of the above misrepresentations and omissions referenced in the above emails, letters, spreadsheets, and statements were made with the intent to deceive the Plaintiffs.

147.    Former defendant John William Beakley (as well as the Entity Defendants herein for whom he acted) obtained concrete and personal benefits to resulting from this deception as they had more time to use the Douglasses money and make fees, as applicable, at the very minimum.

148.    During 2011, Plaintiffs requested that former defendant John William Beakley and his various entities (including the Entity Defendants) produce and provide all necessary information relating to their investments so that they could plan their estates. Upon information and belief, former defendant John William Beakley and the entities for whom he acted stalled.

149.    On September 25, 2011, former defendant John William Beakley issued an email in which he first identified a set of demand notices from "GE Franchise

Finance" for full payment of "nearly $2 Million Dollars in two notes that *we* owe

them…" in addition to "the $1,800,000 that *we* owe the IRS for payroll taxes."

(Attached as Exhibit U, excerpt below, emphasis added above):

Sam, Mark, Scott, and Tim:

This past Friday, Michael and I received demand notices from GE Franchise Finance for full payment of nearly $2,000,000 in two notes that we owe to them. This was unexpected as they were working with us to get them refinanced. The larger note came due the end of March 2011, and they renewed it for an additional 90 days while we were working with Pinnacle Finance to get a refinancing done for this and the $1,800,000 that we owe the IRS for payroll taxes. Their original contact fell through and left us without many options. Recently the Pinnacle Finance group found another fund group through their own investment banker called Full Circle Funding. They have had our financials and information for approximately three weeks and we have had three phone conferences with them (including the CEO of the company), the most recent one being a four hour conference Friday afternoon. They are aware of the IRS situation and are still interested. If they decide to move forward they are supposed to have us a term sheet this coming week. With that in hand we will probably be able to keep GE at bay until the new loans can be funded. However, if they do not come through, we will have to in all likelihood file a Chapter 11 bankruptcy petition to try and reorganize the company. We are still suffering from the effects of the $2,000,000 plus hole created by the Food Service Holdings, Ltd. acquisition and the harsh winter of 2010. I never expected that we would be here at this point in time, facing the potential loss of everything that I have ever worked for, including my accounting firm and possibly my CPA license. We are meeting with a bankruptcy attorney on Tuesday afternoon to discuss options. If GE will allow us to enter into a temporary extension of the note then we will not have to do anything immediately. We also owe ADQ and TDQOC for several months of unpaid royalties and advertising fees, and we are not sure if they are going to default us soon or not. Please pray that we will have God's wisdom through what is likely to be a very painful ordeal, that He will protect the company and help us find favor with those that can assist us with this problem. I am sorry that we are at this point for all of us.

John W. Beakley

150.    Although the issue of the notes apparently became a concern prior to that

point in time, upon information and belief, former defendant John William

Beakley and the entities for which he acted had failed to make adequate or timely

reports to the Douglasses in order to properly inform them. In that same email,

former defendant John William Beakley indicated that Bankruptcy was being

considered – without explaining any details – and acknowledged that his actions

may cause him to face the loss of his "accounting firm and CPA license…"

151.    Upon information and belief, the IRS has filed tax liens in excess of $2.5

Million (U.S.) against various properties owned by former defendant John

William Beakley (and certain of the Defendants herein, see Exhibit F). It is now

understood, upon information and belief, that the tax problems are far in excess of that amount. See Exhibit F, in part. Upon information and belief, the defendants who have failed to pay taxes have defrauded the United States Government and subjected the Douglasses' investments to tremendous risk.

152.   Such tax fraud and/or tax non-compliance by those defendants is a violation of law, a violation of duties to the Douglasses as investors, and subjects the Douglasses to further possible loss of their investments depending upon how much, if any, of their investments can be accounted for and how much, if any, remains after paying the outstanding tax obligations.

153.   For each of the misrepresentations complained of in the above paragraphs (for each email, for instance), the Douglasses were ignorant of the state of the issues as represented, and the Defendants making such representations, upon information and belief, knew that they were ignorant.

## H.   Additional Facts Involving the Individual Defendants

154.   Upon information and belief, the remaining Individual Defendants appear to own substantial portions of the various entities co-owned by the Douglasses and started with the Douglasses investments despite the lack of any or a meaningfully similar capital contribution from these individuals. See, in part, Exhibit C, wherein former defendant John William Beakley sent a September 16, 2010 facsimile "drawing" of the various entities and the relationship between the parties (and the various "Beakleys" references therein) (See also, Exhibit D, describing the equalization of investments and the percentages owned).

155.   It appears that at least some of each of the remaining individual defendants

have been paid a salary, vehicle lease payments, and distributions, as well, from entities owned by the Douglasses. All appear to have been paid something and/or appear to have received some benefit from same.

156. For instance, in Exhibit X, which is an Excel spreadsheet not in native format whose file title reads "Historical Distributions and Capital", it appears to describe the "debit[s]", "credit[s]", "balance[s]", and "cash distributions" as to the remaining individuals in this case. See Exhibit X. Although admittedly quite complicated, upon information and belief, the debits appear to be for payments/distributions to the individual named, credits appear to be for money actually paid in or some accounting allocation notation (or similar), and cash distributions appear to note pure cash distributions.

157. For Defendant Mary Jan Beakley (through a section apparently devoted to former Defendant John Beakley and current defendant Mary Jan Beakley), the amount of payments/debits received by her and her spouse appears to be $2,948,114.15; the amount of credits/payments into entities appears to be $875,983.04 (although these may not be actual payments but instead appear to sometimes be allocations, for instance), and the cash distributions to her and her spouse appear to be $1,377,445.18. She also would have benefitted from the fees charged as described above - See Exhibit A to this complaint, for instance, which provides for the income and sources of some of the funds received by former Defendant John William Beakley and Defendant Mary Jan Beakley through these entities and also describing the automobiles at their disposal from same (excerpt below; see also Exhibit N as previously referenced describing accounting fees):

| INCOME | | |
|---|---|---|
| Guarantor fee (1%) - Roundtable Corporation | | $ 150,000 |
| Guarantor fee (1%) - DQ Real Estate Development, Ltd. | | 10,000 |
| Mileage reimbursement (net of payment) - Beakley & Associates, P.C. | | 11,400 |
| Non-taxable fringe benefits (medical) - Commerce Resource Group, Inc. | | 7,500 |
| Salary - Commerce Resource Group, Inc./Beakley & Associates, P.C. | | 26,000 |
| Royalty income (client/contact base) - BGA Design & Development, Ltd. | | 90,000 |
| St. Thomas, USVI residence rentals/reimbursements | | 40,500 |
| Lubbock, Texas residence rental/reimbursements | | 25,575 |
| Partnership income/distributions | | 136,000 |
| Vehicle leases - Roundtable Corporation, et.al. | | 91,200 |
| | Total Income | $ 588,175 |

158.    For Defendant Amy Beakley, the amount of payments/debits received by her appears to be $304,043.16; the amount of credits/payments into entities appears to be $193,640.50 (although these may not be actual payments but instead appear to sometimes be allocations, for instance), and the cash distributions to her appear to be $60,273.71. She is also understood to have been provided an automobile by defendant Roundtable Corporation.  She is also understood to have received at least a portion of Plaintiff Sam Douglass' investment to help finance her education.

159.    For Defendant Joel Beakley, the amount of payments/debits received by him appears to be $287,342.16; the amount of credits/payments into entities appears to be $193,640.50 (although these may not be actual payments but instead appear to sometimes be allocations, for instance), and the cash distributions to him appear to be $55,552.21.

160.    For Defendant David Beakley, the amount of payments/debits received by him appears to be $293,843.13; the amount of credits/payments into entities appears to be $193,640.50 (although these may not be actual payments but instead

appear to sometimes be allocations, for instance), and the cash distributions to him appear to be $62,052.21.

161.    In short, upon information and belief, the remaining Individual Defendants have benefited, at a minimum, from, as applicably described above and herein, salaries, fees, cars, mortgage payments, and ownership in entities without a meaningful capital contribution.

I.    **Former Defendant John William Beakley, Beakley & Associates, P.C. and FLP Management, Inc. Require Registration As Investment Advisers**

162.    "Investment adviser" means any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities.  See, Sec 202(a)(11) of the Investment Advisers Act of 1940.

163.    At all relevant times in this lawsuit, Defendant Beakley & Associates, P.C., and former defendant John William Beakley served as Plaintiffs' investment adviser(s) in connection with all the transactions and activities complained of herein.  Defendant FLP Management, Inc., at the times after which it began acting as general partner and making decisions to invest the Douglasses money, served as Plaintiffs' investment adviser(s) in connection with its applicable transactions and activities complained of herein. Defendant Beakley & Associates, P.C. and FLP Management, Inc. through its principal officer, former defendant John William Beakley, (also believed to be a person associated with an investment adviser as that term is defined in Sec. 202(a)(17) of the Investment Advisor Act of 1940), at all times acted as an Investment Adviser for the Douglasses.

164.    Former defendant John William Beakley, FLP Management, Inc. and Beakley & Associates, P.C. are "persons" as defined in the Investment Advisor Act of 1940.    See Sec. 202(a)(16) of the Investment Advisor Act. For the purposes of the Advisers Act, the term "person" refers to any natural person or any entity, such as a corporation, limited liability company or other entity. Section 202(a)(16) of the Advisers Act, 15 U.S.C. §80b-2(a)(16).

165.    Former defendant John William Beakley, FLP Management, Inc. and Beakley & Associates, P.C. each provided Plaintiffs advice and analysis(es) regarding securities.  Each of the ownership interests in the defendant Entities and other entities formed by former Defendant John William Beakley to be owned to any extent by any or all of Plaintiffs would also, upon information and belief, qualify as a "security".  Section 2(a)(1) of the Securities Act of 1933 provides that, "unless the context otherwise requires", the term "security" includes:

> "Any note, stock, treasury stock, security future, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

166.    The U.S. Supreme Court has said that the definition of a "security" includes "the countless and variable schemes devised by those who seek the use

of the money of others".  *See Marine Bank v. Weaver*, 455 U.S. 551, 555 (1982).

*See also*, *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946).

167.    Former defendant John William Beakley, FLP Management, Inc. and Beakley & Associates, P.C. each were required to register as an investment adviser.    The seminal authority on registration under the Advisers Act is contained in Release 1092, which was issued by the United States Securities and Exchange Commission (SEC) in 1987. See Investment Advisers Act Release No. 1092, 39 S.E.C. Docket 494, 1987 WL 112702 (Oct. 8, 1987) (hereafter referred to as "Release No. 1092").  The Release No. 1092 also noted that the SEC staff has interpreted the definition of investment adviser to include persons who advise clients concerning the relative advantages and disadvantages of investing in securities *in general* as compared to other investments.  See Release No. 1092 at FN 4, attached as Exhibit T.

168.    Former defendant John William Beakley, FLP Management, Inc., and Beakley & Associates, P.C. each were in the business of providing investment advisory services to Plaintiffs, to wit:

a.    Former defendant John William Beakley, FLP Management, Inc., and Beakley & Associates, P.C. held themselves out to the public as providing investment advisory services.  See Exhibit P

b.    Former defendant John William Beakley and Beakley & Associates, P.C. (through its predecessor-named entity, Beakley Garrett & Associates, P.C.) submitted registration and application documents as investment advisers, and within those documents

acknowledged in 1998 that as investment advisers (see Exhibit S for these representations):

i.   They had 2-9 persons performing investment advisory functions;

ii.  They had 15-50 clients to whom they were providing advisory services during 1998 alone;

iii. They held themselves out as providing financial planning or some similarly termed service to clients;

iv.  They actually provided investment advisory services to 15-50 clients;

v.   They provided investment advisory services with regard to over $5,000,000.00 (the highest category permitted) in financial products in 1998;

vi.  They recommended over $1,000,000.00 (the highest category permitted) in securities to clients in 1998 as underwriter, general or managing partner, or in which they had ownership;

vii. They provide investment advisory services and advice on the following types of investments:



c. Former defendant John William Beakley, FLP Management, Inc., and Beakley & Associates, P.C. received compensation and other economic benefit for their role in advising Plaintiffs with regard to their investments, which investments to procure, the value of those investments, and when to buy/sell those investments. Directly, this was through a management fee, but indirectly, it also is alleged by the Douglasses to include the additional accounting, guarantor, and other similar "fees" that were charged to these various entities, as applicable.

d. Upon information and belief, former defendant John William Beakley, FLP Management, Inc., and Beakley & Associates, P.C. provided services as investment advisers to Plaintiffs continually since approximately 2001.

e. Upon information and belief, former defendant John William Beakley, FLP Management, Inc., and Beakley & Associates, P.C.

received compensation and other economic benefits from their providing investment advisory services to Plaintiffs, including but not limited to in the form of the fees, salaries, loans, distributions, ownership interests, automobiles, unilateral control, and other economic benefit stemming directly and indirectly from the provision of advisory services to Plaintiffs.

169.    For example, in addition to the respective facts alleged above showing the investment arrangement, on March 4, 2011, Plaintiff Timothy Douglass emailed former Defendant John William Beakley and asked about investing in/creating a Roth IRA (attached as Exhibit L). In response, on March 4, 2011, former defendant John William Beakley emailed Plaintiff Timothy Douglass and indicated that "I would rather you let me prepare a 401(k) plan for you for your corporation. I can show you how it will be much more lucrative for you to do it that way and then you don't have to mess with the IRA limitations. Just let me get past April 15th before we discuss further." (attached as Exhibit L; see also Exhibit H, describing the "growth stock", describing the "investment earnings rate" that was estimated).

170.    In their capacities as investment advisor for the individual Plaintiffs and the entities herein, Defendant Beakley & Associates, P.C. and FLP Management, Inc., each through their principal officer, former Defendant John William Beakley, have, upon information and belief, charged the Plaintiffs at least thousands of dollars in compensation, either directly or through the "fees" described herein such as, for instance, those known fees identified in Exhibit N,

Exhibit X (the historical distribution analysis), and Exhibit A). In Exhibit X, for example, the historical distribution appears to indicate that FLP Management, Inc. received at least $46,283.76 in and through the debit calculation, and it also appears to have been allocated $54,215 in various reclassifications, closing entries, recordation of income allocation, checks to Roundtable, to record income allocation, and to allocate "PY" income to "PTRS." They each appear to have received economic benefit over and above the direct payment of monies by the Douglasses. Former defendant John William Beakley, and correspondingly Defendant Beakley & Associates, P.C. and FLP Management, Inc., appear to have allowed and/or directed substantial funds to be funneled to other entities and persons as described herein instead of to the Douglasses. For instance, the intermingling problems identified and the use of former defendant Roundtable Corporation's funds to help a number of other entities that were not owned by the Douglasses is inappropriate.

171.    Upon information and belief, the investment advisory services provided to Plaintiffs were not solely incidental to accounting services rendered to Plaintiffs. While the SEC has acknowledged that registration as an investment adviser may not be required when advisory services are solely incidental to accounting services, such is exemption is not available to former defendant John William Beakley and Beakley & Associates, P.C. because:

    a.   they held themselves out as financial planners and investment advisers (see Exhibit P, an excerpt from Beakley & Associates, P.C.'s homepage);

b.  any fees paid for accounting services were separate and apart from the compensation and economic benefit derived from the provision of advisory services.  Notwithstanding same, Plaintiffs do not concede that any of the so called "accounting fees" were reasonable or for accounting services actually rendered as that information is solely and peculiarly within the knowledge of those defendants.  Notwithstanding, it is believed that all, or at least a portion, of the so called "accounting fees" should be included in the calculation of compensation and economic benefit received by defendants as a direct result of the advisory services provided to Plaintiffs, and

c.  the accounting services, if any, actually provided to Plaintiffs were separate and distinct from the broad ranging and all-encompassing advice related to the investment of the Douglass monies and the valuation, hypothecation, and the management of those investments.

d.  When the former defendant John William Beakley and Beakley & Associates, P.C. held themselves out to the public as providing financial planning services (See, e.g., Exhibits P and S brochure and RIA application), the performance of those services is not "solely incidental" to any practice of accounting.  See Release No. 1092, *supra,* at footnote 4, attached as Exhibit T.  In other words, the Douglasses understand that the SEC's position is that a CPA

who holds himself out to the public as a financial planner or pension consultant, or as a provider of other financial advisory services, is, by definition, an "investment adviser" who must register under the Advisers Act. *See*, *e.g.,* Hungerford, Aldrin, Nichols & Carter, SEC No-Action Letter, 1991 WL 290535 (Dec. 10, 1991), attached as Exhibit W.

e. The SEC has emphasized the narrow scope of the "incidental" exception in a number of No Action letters.  See *S & D Trading Academy, LLC v. AAFIS Inc*., 336 Fed. Appx. 443, 449, 2009 WL 1885881, 6 (5th Cir. (Tex.) 2009) (analyzing "incidental" conduct for the analogous exemption in the Texas Securities Act).  To meet the test of "incidental", the activity really must be *de minimis*.

172.    In addition to their failure to register under the IAA, upon information and belief, former defendant John William Beakley, FLP Management, Inc., and Beakley & Associates, P.C. violated Sections 205, 206, 207 and 208 of the IAA by:

a. by unilaterally taking compensation for investment advisory services on the basis of a share of capital gains or upon capital appreciation of the funds of the Plaintiffs.  See Sec. 205(a)(1)

b. by assigning the benefits, fees and compensation derivative of the agreement to provide investment advisory services to others, namely the Beakley entities and individual defendants.  See 205(a)(2).

c. by engaging in transactions prohibited by Sec. 206 of the Act,

including at a minimum: (1) engaging in transactions, practice(s) and course(s) of business that operated as a fraud and deceit upon Plaintiffs as described herein; (2) acting as a principal for his own account in transactions with the Plaintiffs without the necessary disclosures required under Sub-section (3) of Sec. 206; (3) by acting fraudulently, deceptively, and manipulatively in causing the Plaintiffs to be exposed to unnecessary, unsuitable, and unreasonable risk in their managed accounts in light of their age, employment status, investment objectives, risk tolerances, tax status, and financial condition, while at the same time failing to make necessary disclosures and to refrain from self-dealing; and (4) by issuing reports and analyses of securities sold to and owned by Plaintiffs for compensation and other economic benefit (which were wrong, upon information and belief, as described herein).

173.    Upon information and belief, former Defendant John William Beakley, Beakley & Associates, P.C., and FLP Management, Inc. are not registered brokers or dealers under the Exchange Act of 1934.

174.    Additionally, as indicated in the factual background of this Complaint and upon information and belief, Defendant Beakley & Associates, P.C. and FLP Management, Inc.  by and through former Defendant John William Beakley had obligations to provide full disclosures of conflicts of interest to the Douglasses, to provide suitable advice to the Douglasses, to provide a reasonable basis for recommendations, to provide the best execution of the clients transactions

(instead of providing itself and the related Defendants with compensation that was the least favorable to the Douglasses under the circumstances), to avoid principal transactions, to avoid pooled investment vehicles in which the Defendants owned significant portions of, acting in Agency Cross Transactions (by acting as both seller of interests, buyer of interests, and owner of interests sold), effecting cross-trades between the Douglasses and the various Beakley Defendants' interests, improper participation in investment vehicles, and failing to adopt or enforce a code of ethics.

175.   As indicated in the factual background of this Complaint and upon information and belief, Defendants misrepresentations and omissions, deceit and artifice in connection with their advice and recommendation to Plaintiffs operated as a fraud upon the Douglasses, the Douglasses have been damaged as a result, and the Douglasses are entitled to restitution, to rescind all contracts with Defendant Beakley & Associates, P.C. by and through former Defendant John William Beakley, and/or are entitled to recover disgorgement of all fees paid by Plaintiffs and all economic benefit received by those defendants as a result of Defendant Beakley & Associates, P.C., FLP Management, Inc. and former Defendant John William Beakley's conduct as investment advisers.

176.   Furthermore, upon information and belief, every purchase of securities in violation of the Investment Advisor Act of 1940 was void and Plaintiffs are entitled to, and hereby request the Court to, void the agreements with Plaintiffs and further rescind each underlying transaction made in violation of the Act, and thereby award Plaintiffs all restitution of the consideration and economic benefit

given or taken under the agreement with Plaintiffs, less any value conferred by the applicable defendants.

## V.    FIRST CAUSE OF ACTION
### Violation of Investment Advisers Act of 1940

**(against Defendant Beakley & Associates, P.C. and FLP Management, Inc.)**

177.    The Douglasses re-allege each and every allegation set forth in the paragraphs above and below, including but not limited to those described in the factual background section of this Complaint, and they incorporate them herein by reference.

178.    As indicated in the factual background of this Complaint, upon information and belief, Defendant Beakley & Associates, P.C. violated the Investment Advisers Act of 1940, including but not limited to Sections 203, 205, 206, 207, and 208 of said Act, thereby rendering the agreement to provide investment advisory services void, and entitling Plaintiffs as a matter of law to rescind that agreement and to receive disgorgement of all fees, compensation, and other economic benefit received by the investment adviser and persons associated with investment adviser Defendants. See *Transamerica Mortgage Advisers v. Lewis*, 444 U.S. 11, 18-24, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979), in which the Supreme Court recognized a private right of action for rescission of investment advisory contracts and for restitution of consideration paid under such contracts if they are void under Section 215. The Supreme Court concluded further that when Congress declared in § 215 that certain contracts are void, it intended that the customary legal incidents of voidness would follow, including the availability of a suit for rescission or for an injunction against continued operation of the contract,

and for restitution.  *Id*. at 18.

179.    As indicated in the factual background of this Complaint, upon information and belief, Defendant Beakley & Associates, P.C. and FLP Management, Inc. each violated the Investment Advisers Act of 1940, at a minimum, by failing to register as an investment adviser when such registration was required.  See Sec. 203.

180.    As indicated in the factual background of this Complaint, upon information and belief, Defendant Beakley & Associates, P.C. and FLP Management, Inc. each violated the Investment Advisers Act of 1940, at a minimum, by unilaterally taking compensation for investment advisory services on the basis of a share of capital gains or upon capital appreciation of the funds of the Plaintiffs.  See Sec. 205(a)(1).

181.    As indicated in the factual background of this Complaint, upon information and belief, Defendant Beakley & Associates, P.C. and FLP Management, Inc. each violated the Investment Advisers Act of 1940, at a minimum, by assigning the benefits of the agreement to provide investment advisory services to others, namely the entities and individual defendants specifically indicated herein.  See 205(a)(2).

182.    As indicated in the factual background of this Complaint, upon information and belief, Defendant Beakley & Associates, P.C. and FLP Management, Inc. each violated the Investment Advisers Act of 1940, at a minimum, by engaging in transactions prohibited by Sec. 206 of the Act, including at a minimum:

a. Employing a device, scheme or artifice to defraud the Plaintiffs;

b. Engaging in transactions, practice and course of business that operated as a fraud and deceit upon Plaintiffs; and

c. Acting as a principal for his own account in transactions with the Plaintiffs without the necessary disclosures required under Sub-section (3) of Sec. 206.

183.    As indicated in the factual background of this Complaint, upon information and belief, Defendant Beakley & Associates, P.C. and FLP Management, Inc. each violated the Investment Advisers Act of 1940, at a minimum, by acting fraudulently, deceptively, and manipulatively in causing the Plaintiffs to be exposed to unnecessary, unsuitable, and unreasonable risk in their managed accounts in light of their age, employment status, investment objectives, risk tolerances, tax status, and financial condition, while at the same time failing to refrain from self-dealing.

184.    Concerning any violations of the IAA dependent on specifically alleged fraudulent activities, to the extent necessary, upon information and belief, these would include, at a minimum, the specific acts of the June 3, 2009 email (Exhibit G); the August 25, 2010 Email and Spreadsheet (Exhibit H); the September 16, 2010 letter (Exhibit D), the January 7, 2011 email (attached as Exhibit I) and the Summer of 2011 telephone conversations – each of which is referenced and described at length in the factual background section of this complaint.

185.    As indicated in the factual background of this Complaint, upon information and belief, Defendant Beakley & Associates, P.C. and FLP

Management, Inc. each by and through former Defendant John William Beakley has acted as an investment adviser as has engaged in the business of providing advice to the Douglasses, at a minimum, and issuing reports and analyses of securities for compensation and other economic benefit. Upon information and belief, at no time was the advice given in this case incidental to any accounting or other professional activity. Upon information and belief, neither of Defendants Beakley & Associates, P.C., FLP Management, Inc. or former Defendant John William Beakley are registered as a broker or dealer under the Exchange Act.

186.    As indicated in the factual background of this Complaint, upon information and belief, Defendant Beakley & Associates, P.C. and FLP Management, Inc. each by and through former Defendant John William Beakley (or through such other designee of their choice) had obligations to provide full disclosures of conflicts of interest to the Douglasses, to provide suitable advice to the Douglasses, to provide a reasonable basis for recommendations, to provide the best execution of the clients transactions (instead of providing itself and the Beakley Defendants with compensation that was the least favorable to the Douglasses under the circumstances), to avoid principal transactions, to avoid pooled investment vehicles in which the Beakley Defendants owned significant portions of, acting in Agency Cross Transactions (by acting as both seller of interests, buyer of interests, and owner of interests sold), effecting cross-trades between the Douglasses and the various Beakley Defendants' interests, improper participation in investment vehicles, and failing to adopt or enforce a code of ethics. Upon information and belief, each of the stated defendants failed to

reasonably and prudently discharge these statutory obligations.

187.    As indicated in the factual background of this Complaint, upon information and belief, Defendants Beakley & Associates, P.C. and FLP Management, Inc. misrepresentations and omissions, deceit and artifice in connection with their advice and recommendations to Plaintiffs operated as a fraud upon the Douglasses, the Douglasses have been damaged as a result, and the Douglasses are entitled to restitution, to rescind all agreements for investment advisory services and the transactions derived therefrom, and/or are entitled to recover disgorgement of all fees paid by Plaintiffs and economic benefit received by defendants as a result of the stated defendants' conduct as investment advisers.

188.    Upon information and belief, every purchase and sale of securities in violation of the Investment Advisor Act of 1940 was void and Plaintiffs are entitled to, and hereby requests the Court to, void the agreements with Plaintiffs and further rescind each transaction made in violation of the Act, and thereby award Plaintiffs all restitution of the consideration given under the agreement with Plaintiffs, less any value conferred by the applicable defendants to Plaintiffs.

## VI.    SECOND CAUSE OF ACTION
## COMMON LAW FRAUD

**(against Defendant Beakley & Associates, P.C. ,FLP Management, Inc., and the Entity Defendants that the Douglasses Directly Invested In According to the Defendants' Representations in the Exhibits Attached to this Complaint)**

189.    The Douglasses re-allege each and every allegation set forth in the paragraphs above and below, including but not limited to those described in the factual background section of this Complaint, and they incorporate them herein by reference. elements of common law fraud are: (1) that a material representation

was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury.[3]

190.    Common law fraud may also occur when: (1) a party conceals or fails to disclose a material fact within the knowledge of that party; (2) the party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth; (3) the party intends to induce the other party to take some action (or refrain from acting) by concealing or failing to disclose the fact; and (4) the other party suffers injury as a result of acting without knowledge of the undisclosed fact.[4]

191.    Upon information and belief, common-law fraud occurred in and through, at a minimum, the specific acts (the material misrepresentations and omissions) of the June 3, 2009 email (Exhibit G); the August 25, 2010 Email and Spreadsheet (Exhibit H); the September 16, 2010 letter (Exhibit D), the January 7, 2011 email (attached as Exhibit I) and the Summer of 2011 telephone conversations – each of which is referenced and described at length in the factual background section of this complaint.

192.    Generally, and without repeating every fact and sentence alleged in the factual background for purposes of brevity, as indicated in the factual background

---

[3] *Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 774 (Tex. 2009).

of this Amended Complaint, and upon information and belief, former defendant John William Beakley, acting in his representative capacities, made material misrepresentations to the Douglasses, including, at minimum, the value of their investments, the value of rates of return on their investments, past and current successes, the fees charged, the care and control over the investments, tax problems, validity of "borrowing" money from the United States Government, etc., including those representations made in the June 3, 2009 email, the August 25, 2010 email and spreadsheet, the  September 16, 2010 letter, the  January 7, 2011 email, and the 2011 telephone conversations, as described above.

193.   As indicated in the factual background of this Complaint, upon information and belief, certain material facts within the knowledge of former defendant John William Beakley, acting in his representative capacities, were concealed and/or not disclosed, including but not limited to the commingling of funds amongst the various entities described herein, the actual rates of returns on the various "investments," the actual value of the "investments," the various "fees"/expenses to related parties being charged to the various entities described herein, undisclosed creditor obligations, the outstanding obligations to the IRS and the tax fraud/non-compliance described herein, the various accounting difficulties described herein, the use of former Defendant Roundtable Corporation to provide resources to some of the remaining entities, which such facts could have been disclosed at any time and in any communication made to the Plaintiffs including but not limited to the June 3, 2009 email, the August 25, 2010 email and

---

4 *Bradford v. Vento*, S.W.3d 749, 754-55 (Tex. 2001).

spreadsheet, the  September 16, 2010 letter, the  January 7, 2011 email, and the 2011 telephone conversations.

194.    Generally, and without repeating every fact and sentence alleged in the factual background for purposes of brevity, as indicated in the factual background of this Amended Complaint, and upon information and belief, former defendant John William Beakley's, acting in his representative capacities, representations to the Douglasses were false.

195.    Generally, and without repeating every fact and sentence alleged in the factual background for purposes of brevity, as indicated in the factual background of this Amended Complaint, and upon information and belief, when former defendant John William Beakley, acting in his representative capacities, made representations to the Douglasses, he knew they were false or made them recklessly without any knowledge of the truth and as a positive assertion.

196.    Generally, and without repeating every fact and sentence alleged in the factual background for purposes of brevity, as indicated in the factual background of this Amended Complaint, and upon information and belief, former defendant John William Beakley, acting in his representative capacities, made the representations with the intent that the Douglasses act upon them. Upon information and belief, he could not have risked them demanding an immediate return of capital, blowing the whistle, or in any way doing anything to try to stop what was happening.

197.    As indicated in the factual background of this Complaint, the Douglasses did rely upon them and acted in reliance upon the misrepresentations.  They kept

their money invested with these entities, at a minimum, and were not able to try to correct the massive tax problems that were ongoing. They were unable to act to get try to get their money out or at least try to minimize the damages that they now suffer – especially at a time before the Department of Treasury is understood to have begun its levies and before more tax non-compliance/fraud occurred. Upon information and belief, they were unable to "blow the whistle", figuratively speaking, on the problems and to shed light on how best to resolve those problems, and they were unable to salvage remaining value before the tax fraud problems appeared to exceed any remaining assets.

198.    As indicated in the factual background of this Complaint, the Douglasses have suffered injury and actual damages thereby. They appear to have lost all or a very significant portion of their invested funds and the "significant gain" of such funds following their initial investment in the stock market (the "significant gain" as represented in Exhibit D).

199.    Generally, and without repeating every fact and sentence alleged in the factual background for purposes of brevity, as indicated in the factual background of this Amended Complaint, and upon information and belief, former defendant John William Beakley knew that the Plaintiffs were ignorant of these facts and did not have an equal opportunity to discovery the truth. They could not have known, as a practical matter, and did not know. They were unsophisticated, non-connected investors in various entities controlled, managed, and acted through by others.

200.    Generally, and without repeating every fact and sentence alleged in the

factual background for purposes of brevity, as indicated in the factual background of this Amended Complaint, and upon information and belief, former defendant John William Beakley intended the Plaintiffs to rely on these omissions and/or concealments and refrain from withdrawing or attempting to withdraw any of the Plaintiffs' funds from the various entities described herein (including the Entity Defendants through which the Douglasses are known to have invested based on Defendants' admissions in the above and in the Exhibits attached hereto) and to continue to trust in and rely on these advisors and the entities through which the money was invested.

201.    Generally, and without repeating every fact and sentence alleged in the factual background for purposes of brevity, as indicated in the factual background of this Amended Complaint, and upon information and belief, the Plaintiffs relied on these omissions and/or concealments to their detriment and have suffered injury and actual damages thereby. These damages would include, at a minimum, the money invested and the "significant gain" that allegedly came to be as referenced in Exhibit D.

202.    A principal may be vicariously liable for the fraudulent conduct of its agent if the agent acted with actual or apparent authority or if the principal ratified the conduct.[5] All of the above described misrepresentations and/or concealments were accomplished by former defendant John William Beakley in his capacity as partner, officer, authorized agent, vice-principal, or employee, as applicable,

---

[5] *NationsBank v. Dilling*, 922 S.W2d 950, 952-53 (Tex. 1996); *City Nat'l Bank v. Martin*, 8 S.W. 507, 509 (Tex. 1888); *Disney Enters. v. Esprit Fin., Inc.*, 981 S.W.2d 25, 31 (Tex. App.—San Antonio 1998,  pet. dism'd).

acting with full and/or apparent authority of Defendant Beakley & Associates, P.C., Defendant FLP Management, Inc., and the Entity Defendants through whom the investments were made in this case (the known entities through whom investments were made as reflected in the exhibits and above factual allegations). (See also the further discussion on agency liability, below, incorporated herein by reference).

203.    Upon information and belief, the discovery rule would apply to any actions of fraud in this case wherein the Douglasses did not know about same (and could not reasonably have known about same).  *See, e.g., Little v. Smith,* 943 S.W.2d 414, 420 (Tex. 1997).

### VII.    <u>THIRD  CAUSE OF ACTION</u>
**Breach of Fiduciary Duty**
**FLP Management, Inc., and Beakley & Associates, P.C.**

204.    The Douglasses re-allege each and every allegation set forth in the paragraphs above and below, including but not limited to those described in the factual background section of this Complaint, and they incorporate them herein by reference.

205.    The elements of a breach of fiduciary claim are that (1) a fiduciary relationship between the plaintiff and defendant existed; (2) the defendant breached its fiduciary duty to the plaintiff; and (3) the defendant's breach resulted in injury to the plaintiff or benefit to the defendant.  *See, e.g., Dernick Resources v. Wilstein*, 312 S.W.3d 864, 877 (Tex. App.—Houston [1st Dist.] 2009). Furthermore, "[a] fiduciary relationship imposes a duty on the fiduciary to render full and fair disclosure of facts material to the relationship giving rise to the duty."

*See id.* Additionally, the discovery rule appears to apply to same. *See, e.g., Little v. Smith,* 943 S.W.2d 414, 420 (Tex. 1997).

206. Partners owe a fiduciary relationship to each other.[6] In fact, managing partners owe the other partners one of the highest fiduciary duties recognized under the law.[7] Thus, Defendant FLP Management, Inc., while serving as General (managing) Partner in each of the individual DELs, owed the limited partners (Plaintiffs) fiduciary duties.

207. Additionally, upon information and belief, Defendant Beakley & Associates, P.C. owed Plaintiffs fiduciary duties based on the facts stated herein, including but not limited to Beakley & Associates' role as agent, accounting firm, and/or investment advisor to the Plaintiffs in addition to the fact that Plaintiffs were accustomed to being guided by the judgment and/or advice of Defendant Beakley & Associates, P.C., that the Plaintiffs were longtime friends with former Defendant John William Beakley and maintained a justifiable belief that Defendant Beakley & Associates P.C., by and through the actions of former defendant John William Beakley, would act in the Plaintiffs best interests, including but not limited to actions taken in Defendant Beakley & Associates P.C.'s role as the Accounting Firm and/or Investment Advisor to the Plaintiffs.[8]

---

[6] *M.R. Champion, Inc. v. Mizell*, 904 S.W.2d 617, 618 (Tex. 1995).

[7] *See, e.g., Huffington v. Upchurch*, 532 S.W.2d 576, 579 (Tex. 1976).

[8] See, e.g., Woodbine Elec. Service, Inc. v. McReynolds, 837 S.W.2d 258, 262 (Tex. App.—Eastland 1992, no writ) ("there can be a 'fiduciary relationship' between a certified public accountant and a client"); Dominguez v. Brackey Enterprises, Inc., 756 S.W.2d 788, 791 (Tex. App.—El Paso 1988, writ denied) ("Where a party is accustomed to being guided by the judgment or advice of another in legal and accounting matters relating to income taxation, and

208.    Upon information and belief, both Beakley and Associates, P.C. and FLP Management, Inc., in part by and through actions and inactions of former defendant John William Beakley and their relationships described above, were at all times fiduciaries to the Douglasses. Defendant Beakley & Associates, P.C. and FLP Management, Inc.. by and through the actions and inactions former defendant John William Beakley, their agent, took an unfair advantage of their trust, and did not avoid conflicts of interest. As Justice Cardozo indicated in *Meinhard v. Salmon*[9]: "[m]any forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions. Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd." Furthermore, fiduciaries are in a unique position to do greatest harm - "[h]e might steal a march on his comrade under cover of the darkness, and then hold the

---

there exists a long association in a business relationship, as well as a personal friendship, the first party is justified in placing confidence in the belief that the other party will act in his best interest."); Western Reserve Life Assur. Co. of Ohio v. Graben, 233 S.W.3d 360, 374 (Tex. App.—Fort Worth 2007, pet. denied) ("Hutton was much more than a mere order-taker to the Clients—he acted as a financial advisor whom the Clients trusted to monitor the performance of their investments and recommend appropriate financial plans to them. Accordingly, the duty that Hutton owed the Clients went well beyond the 'narrow' duty of executing trade orders.").

[9] 249 N.Y. 458, 164 N.E. 545 (Ct. App. N.Y., Dec. 31, 1928) (publicly accessed) (internal citations omitted).

captured ground. Loyalty and comradeship are not so easily abjured."[10] That is exactly what has happened in this case. Defendant Beakley & Associates, P.C. by and through former defendant John William Beakley, upon information and belief, has stolen a march on the Douglasses and have attempted to hold the captured ground. Loyalty and comradeship should again not be so easily abjured.

209.    Fiduciaries owe general duties of loyalty and good faith; a duty of candor; the duty to refrain from self-dealing (which extends to the fiduciary's spouse, agents, employees, and other persons whose interests are closely identified with those of the fiduciary); a duty to act with integrity of the strictest kind; a duty of fair and honest dealing; and a duty of full disclosure.[11] Furthermore, partners owe other partners a duty of full disclosure on all matters affecting the partnership and a duty to account for all partnership property and profits.[12]

210.    Upon information and belief, as described herein, Defendant FLP Management, Inc., while serving as General Partner in each of the individual DELs and as investment advisor, and Defendant Beakley & Associates, P.C., while serving as accountant and investment advisor, breached their fiduciary duties to Plaintiffs as described in the paragraphs above, including but not limited to, as applicable:

---

[10] *Id.*

[11] See Kinzbach Tool Co. v. Corbett-Wallace Corp., 160 S.W.2d 509, 512 (Tex. 1942); Welder v. Green, 985 S.W.2d 170, 175 (Tex. App.—Corpus Christi 1998, pet. denied); Dearing, Inc. v. Spiller, 824 S.W.2d 728, 733 (Tex. App.—Fort Worth 1992, writ denied); Hartford Cas. Ins. Co. v. Walker Cty. Agency, Inc., 808 S.W.2d 681, 687-88 (Tex. App.—Corpus Christi 1991, no writ); Johnson v. Peckham, 120 S.W.2d 786, 788 (Tex. 1938).

a.   Engaging or allowing in the engagement in non-arm's length transactions with others without issuance of notice and/or obtaining Plaintiff's permission;

b.   Failing to provide the Plaintiffs with accurate financial data and financial statements;

c.   Upon information and belief, receiving money from and/or charging Plaintiffs and Plaintiffs entities for expenses which either were not attributable to their operations or were unreasonable;

d.   Billing and/or collecting fees directly from Plaintiffs through certain entities, including but not limited to the Entity Defendants, without direct and knowing advice and consent of the individual Plaintiffs;

e.   Allowing investments into entities that were actively engaged in tax fraud (or at least not preventing such fraud, minimizing the impact of such fraud once it started, and/or advising the Douglasses of such fraud);

f.   As a direct and proximate result of these Defendants' breach of their fiduciary duties, Plaintiffs have suffered damages in the amounts of at least their initial investment and the "significant" gain thereto as referenced in Exhibit D.

211.   The conduct described herein has proximately caused Plaintiffs to suffer

---

[12] See Brosseau v. Ranzau, 81 S.W.3d 381, 394 (Tex. App.—Beaumont 2002, pet. denied); see also, Tex. Bus. Orgs. Code 152.205.

actual and consequential damages, and pre-judgment and post-judgment interest as allowed by law.

## VIII.   FOURTH CAUSE OF ACTION
### Unjust Enrichment & Assumpsit (against all Defendants)

212.    Alternatively, upon information and belief, all Defendants herein are liable under theories of unjust enrichment and assumpsit.   Upon information and belief, this would include non-alternative allegations against the entity defendants not claimed, at this time, to have committed fraud due to the extensive intermingling and the extensive provision of money through entities the Douglasses did own, such as former Defendant Roundtable Corporation (as referenced above; i.e., former Defendant Roundtable Corporation, an entity admittedly owned by the Douglasses in part, provided money to support other defendants).   Upon information and belief, it also includes all individual defendants as described above.  Upon information and belief, it would also include all entity-defendants who are alleged to be investment advisors and fiduciaries, in the alternative, and it also includes all non-investment-advising-entity-defendants who are alleged to have committed fraud, in the alternative.

213.    Unjust enrichment is an equitable principle requiring one who receives benefits unjustly to make restitution for those benefits. A plaintiff may recover under an unjust enrichment theory if a defendant obtains a benefit from the plaintiff by fraud, duress, or the taking of an undue advantage.[13] Additionally, unjust enrichment occurs when the defendant wrongfully secures a benefit or

---

[13] *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992).

passively receives a benefit which would be unconscionable to retain.[14] A plaintiff may be able to bring a claim for unjust enrichment as an independent cause of action.[15] Even if unjust enrichment were not an independent cause of action[16], Plaintiffs have plead the requisite "fraud, duress, or undue advantage" such that Plaintiffs are entitled to recovery for unjust enrichment.

214.    Furthermore, upon information and belief, the elements under Texas law to recover under an assumpsit cause of action are that: (1) plaintiff paid money; (2) for the use and benefit of defendant; and (3) Defendants' use and retention of the benefit without repayment would be against the fundamental principles of justice and equity. *See, e.g., Excess Underwriters at Lloyd's v. Frank's Casing Crew and Rental Tools, Inc*., 246 S.W.3d 42, 49 (Tex. 2008); *King v. Tubb*, 551 S.W.2d 436, 442 (Tex. Civ. App.—Corpus Christi 1977).

215.    Additionally, upon information and belief, Plaintiffs have pled facts which show that the Defendants have wrongfully and/or passively secured or received benefits which would be unconscionable for Defendants to retain, including without limitation (as applicable):

a. As indicated in the Receiver's Third Interim Report, "[i]n large

---

[14] *City of Corpus v. S.S. Smith & Sons Masonry, Inc*., 736 S.W.2d 247, 250 (Tex. App.—Corpus Christi 1987, writ denied).

[15] *See, e.g., Pep Corp. v. Galliford*, 254 S.W.3d 457, 460 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) ("Unjust enrichment is an independent cause of action.") (citing to *HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 891 (Tex.1998)).

[16] Although certain Texas Courts of Appeals have held that there is no such cause of action, the Texas Supreme Court has suggested otherwise on numerous occasions. *See Elledge v. Friberg-Cooper Water Sup.*, 240 S.W.3d 869,

part, cash from Roundtable Corporation sustained the operations of the entities currently subject to the Receivership Order."   (Dkt. 150), (Exhibit Q hereto);

b.   The comingling of funds among the various entity Defendants herein, also confirmed in the Receiver's Report (such that comingled funds provided by entities the Douglasses owned or provided by the Douglasses to other entities/persons would be unjustly enriched thereby, upon information and belief);

c.   Upon information and belief, receiving money from and/or charging Plaintiffs and Plaintiffs entities for fees, which at a minimum, were unreasonable;

d.   Billing and/or collecting fees and/or "salaries" and/or distributions and/or "loans" directly from Plaintiffs through certain entities, including but not limited to the Entity Defendants, without direct and knowing authorization of the individual Plaintiffs;

e.   Receipt of portions of the various entities described despite the lack of capital contributions;

f.   Vehicles as referenced herein;

g.   Payments/reimbursements of mortgages as referenced herein, and

h.   The specific payments and transactions referenced in Exhibit X., the Historical Analysis, as described herein.

---

869 (Tex. 2007); *Wagner & Brown, Ltd. v. Horwood*, 58 S23d 732, 737 (Tex. 2001); *Fortune Prod. v. Conoco, Inc.*, 52 S.W.3d 671, 685 (Tex. 2000); *HECI Expl. Co. v. Neel*, 982 S.W.2d 881, 885, 891 (Tex. 1998).

216.    The Defendants have received benefits unjustly, and they should make restitution for those benefits. Defendants' use and retention of these benefits without repayment would be against the fundamental principles of justice and equity.

## IX.    FIFTH CAUSE OF ACTION
### Equitable Accounting & Equitable Asset Protection

217.    The Douglasses re-allege each and every allegation set forth in the paragraphs above and below, including but not limited to those described in the factual background section of this complaint, and they incorporate them herein by reference.

218.    The facts and accounts presented by this action are extraordinarily complex. The remaining Defendants have thus far refused to provide a verified accounting. The Douglasses do not know the extent of their assets and interests that remain, nor do they know how leveraged those assets or interests are, nor do they know where and how their money has been used, except from the unsworn documents that are attached to this complaint (that may or may not be correct) and the Receiver's Report at Dkt. 150 (Exhibit Q).

219.    An accounting is necessary for the purpose of determining justice between the parties.

220.    Adequate relief may not be obtained at law as the records are maintained by the Defendants named herein, not the Douglasses, and the defendants are presumably in a much greater position to make sense out of any such records.

221.    Therefore, the Douglasses ask the Court to appoint a neutral, qualified Auditor to have the full and complete authority to gather, examine, and digest all

accounts and records and to make a report thereof to the Court, and/or a complete, verified accounting that traces the Douglasses' funds.

## X.    SIXTH CAUSE OF ACTION
### Agency Liability / Joint and Several Liability

222.    The Douglasses re-allege each and every allegation set forth in the paragraphs above and below, including but not limited to those described in the factual background section of this Complaint, and they incorporate them herein by reference.

223.    Upon information and belief, the statements, actions, omissions, misstatements and other improper conduct complained of herein were admittedly largely made by former defendant John William Beakley.  But, on information and belief, they were made in his capacity and within the course and scope as partner, officer, authorized agent, vice-principal, and/or employee (as applicable, depending on the entity), acting with full authority of and within the exact scope of authority for the entities described herein.

224.    Upon information and belief, the Defendants who are liable for the acts of former Defendant John William Beakley, as described above, are liable, at a minimum, for the harm caused to Plaintiffs by the acts of former Defendant John William Beakley committed within the scope of his actual and/or apparent authority, under general agency laws in this State.[17]

---

[17] *See Grace Cmty. Church v. Gonzales*, 853 S.W.2d 678, 680 (Tex. App—Houston [14th Dist.] 1993, no writ) ("An 'agent' is one who is authorized by another to transact business or manage some affair. The agency relationship does not depend on express appointment or assent by the principal; rather it may be implied from the conduct of the parties under the circumstances.") (citations omitted).

225.    Additionally, upon information and belief, the Defendants who are liable for the acts of former defendant John Beakley, as described above, are liable under the theory of respondeat superior.[18] Former Defendant John William Beakley was an employee, at a minimum, of the various entity defendants described above. The statements, actions, omissions, misstatements and other improper conduct complained of herein occurred within the scope of his employment of these entities and Plaintiffs were injured as a result.

226.    Additionally, as described above, certain Defendants herein are limited partnerships organized under Texas law (e.g., FLP Real Estate Development, Ltd., I-27 Marine & RV, Ltd., DQ Real Estate Development, Ltd., etc.). Upon information and belief, these Defendants are also liable under the Texas Business Organizations Code for the above described acts of former Defendant John William Beakley (or a former defendant John William Beakley-controlled Entity Defendant) committed in the ordinary course of business of the partnership or with authority of the partnership.[19]

227.    Additionally, as described above, certain Defendants herein are Texas

---

[18] See, e.g., GTE Southwest, Inc. v. Bruce, 998 S.W2d 605, 617-18 (Tex. 1999) ("Generally, a master is vicariously liable for the torts of its servants committed in the course and scope of their employment. This is true even though the employee's tort is intentional when the act, although not specifically authorized by the employer, is closely connected with the servant's authorized duties. If the intentional tort is committed in the accomplishment of a duty entrusted to the employee, rather than because of personal animosity, the employer may be liable.")

[19] See Tex. Bus. Orgs. Code § 152.301 ("Each partner is an agent of the partnership for the purpose of its business."); Tex. Bus. Orgs. Code § 152.303 ("A partnership is liable for loss or injury to a person, including a partner, or for a penalty caused by or incurred as a result of a wrongful act or omission or other actionable conduct of a partner acting: (1) in the ordinary course of business of the partnership; or (2) with the authority of the partnership."); Tex. Bus. Orgs. Code § 153.152(a) ("Except as provided by this chapter, the other limited partnership provisions, or a partnership agreement, a general partner of a limited partnership: (1) has the rights and powers and

corporations (e.g., FLP Management, Inc., MMPK Restaurants, Inc., I-27 Powersports, Inc., etc.). Upon information and belief, these defendants are also liable under the theory of vice-principal. As described above, upon information and belief, former defendant John William Beakley was, at all relevant times, acting as a corporate officer, manager, and/or performer of nondelegable or absolute duties of the master, as applicable, and appears to have exercised de facto control over all operations of these entities.[20]

228.    Alternatively, upon information and belief, all prior actions of former defendant John William Beakley (or a former defendant John William Beakley-controlled Entity Defendant) were ratified by the entity Defendants described herein.

229.    Because of the agency relationship, upon information and belief, all of the above described Defendants are jointly and severally liable for former defendant John William Beakley's (or a former defendant John William Beakley-controlled Entity Defendant's) conduct while he was acting as authorized agent for each

---

is subject to the restrictions of a partner in a partnership without limited partners;  and (2)  has the liabilities of a partner in a partnership without limited partners to the partnership and to the other partners.")

[20] *See Paul F. Newton & Co. v. Texas Commerce Bank*, 630 F.2d 1111, n. 2 (5th Cir. 1980) ("Decisions by the Texas courts have indicated that a corporation may be held liable for the fraudulent acts of its officers or directors under common law agency principles."); *see also, Bennett v. Reynolds*, 315 S.W.3d 867, 884 (Tex. 2010) ("[V]ice-principal includes four classes of human agents: (a) Corporate officers; (b) those who have authority to employ, direct, and discharge servants of the master; (c) those engaged in the performance of nondelegable or absolute duties of the master; and (d) those to whom a master has confided the management of the whole or a department or division of his business."); *see also, Baca v. Sand, Inc.*, 600 S.W2d 840, 842 (Tex. App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.) ("A corporation is liable for the torts committed by its agents in the scope of their authority to the same extent as any other principal. Where a corporate officer, selected by the company's board of directors, is empowered to manage a distinct phase of the corporate business in every essential respect, his acts in the line of duty are those of a vice-principal, and the corporation is liable for his negligent actions in the performance of his corporate duties.")

respective defendant entity.[21]

## XI.    SEVENTH CAUSE OF ACTION
### (Receivership)

230.    The Douglasses re-allege each and every allegation set forth in the paragraphs above and below, including but not limited to those described in the factual background section of this Complaint, and they incorporate them herein by reference.

231.    The Douglasses respectfully invoke the equitable powers of the Court to protect whatever remaining assets they have, if any. It is believed that the actions described herein are denuding assets and making the probability of a successful recovery at the end of a trial unlikely.

232.    The Douglasses claims are valid for the reasons indicated herein.

233.    Upon information and belief, fraudulent conduct has as described herein. Furthermore, upon information and belief, at least some of these entities have engaged in tax fraud. If those entities who have are willing to take on the IRS, they are most certainly, upon information and belief, willing to take on those that have invested with and through them, respectively. Upon information and belief, the probability that this conduct will continue to occur absent Receiver is high, and it will frustrate the claims.

234.    Despite the Receivership Order, there is still concern by the Douglasses that property will be concealed, lost or diminished in value, as at least some of these defendants are apparently skilled in creating extraordinarily complex

---

[21] *See, e.g., Leyendecker & Associates, Inc. v. Wechter*, 683 S.W.2d 369, 375 (Tex. 1984) (holding that employee

relationships between entities such that finding any remaining property is de minimus. In addition, upon information and belief, further fraud to the United States Government will only result in fewer resources to pay the Douglasses.

235.    There is a tremendous inadequacy of legal remedies, as upon information and belief, waiting for a trial, verdict, appeal, etc. will potentially result in no remedy at all.

236.    There is no less drastic equitable remedy available as former defendant John William Beakley and the named Defendants herein cannot be allowed to guard or manage any remaining assets as this case progresses. They must be removed as guard, and a neutral, qualified receiver should guard same.

237.    Finally, there is no likelihood that appointing a receiver will do more harm than good, as, upon information and belief, the receiver will and has stopped the tax fraud upon the United States Government, at the very least, in addition to possibly being able to help further understand the complicated scheme of entities involved, and providing an accounting for the Court (as has started to have been done in Dkt. 150).

238.    Finally, the Douglasses have strong concerns that certain Defendants are insolvent or very-close to same and that money will continue to be intermingled absent Receiver supervision.

239.    Texas law provides for the appointment of a receiver in these instances. Tex. Civ. Prac. & Rem. Code §64.001, *et seq.,* and the Douglasses ask the Court to allow the Receivership as it currently stands and as subsequently modified.

---

and the employer were jointly and severally liable for the actual damages from employee's libelous letter).

Through this amended complaint, however, the Douglasses are not asking that the agreeably-modified Receivership Order be extended farther than the parties' previous agreement and the Agreed Order.

## XII.    EIGHTH CAUSE OF ACTION
### (Injunction, Preliminary & Permanent)

240.    The Douglasses re-allege each and every allegation set forth in the paragraphs above and below, including but not limited to those described in the factual background section of this Complaint, and they incorporate them herein by reference.

241.    The Douglasses, upon information and belief, are entitled to an injunction to stop the acts complained of in this case, to stop the tax fraud, to stop any other kinds of fraud, and to determine the nature and status of their investments.

242.    As indicated in the factual background of this Complaint, there was irreparable injury in this case as the at least some of the entities herein appeared to be rapidly denuding the assets of the remaining defendants through failures to pay the United States Government payroll taxes, at a minimum (coupled with the intermingling and use of funds as described herein). There is also irreparable injury as the full scope of the injury is exceedingly difficult to determine as a full and complete, verified disclosure has never been provided. Without a preservation injunction, the Douglasses believe that further asset removal or documentary destruction will occur.

243.    There is also no adequate remedy at law, as waiting for the duration of this case to obtain such remedy will be too late. By then any remaining value, if any, would, upon information and belief, be gone.

244.    There is a strong likelihood of success on the merits as there are too many questions presented by this case that logically and practically, upon information and belief, cannot have a moral and just answer. $9.4 Million dollars, approximately, was invested and allegedly grew at good rates up until the 2011 timeframe, as described herein, and then that money, as of 2012, appears to be gone.

245.    The balance of hardships weighs in favor of the injunction as there is no real hardship to these defendants to protect assets and prevent the harm complained of herein. The public interest is best served by same. Through this amended complaint, however, the Douglasses are not asking that the injunctive relief contained in the agreeably-modified Receivership Order be extended farther than the parties' previous agreement.

### XIII.   DISCOVERY RULE

246.    As described herein, he applicable statutes of limitations and/or statutes of repose should be tolled, at a minimum, under the discovery rule, at a minimum.

### XIV.   DOCUMENT POSSESSION & PLEADING

247.    The vast amount of documentary and other evidence in this case necessary to discover the full extent, scope, impact, severity, and duration of the acts complained of herein are within the sole possession and control of defendants, which, upon information, belief, and contention, should and does relax the pleading specificity requirements as to fraud-based allegations.[22]   Subject to the

---

[22] *See McNamara v. Bre-X Minerals Ltd McNamara v. Bre-X Minerals Ltd.*, 197 F.Supp.2d 622, 672 (E.D. Tex. 2001). ("Kilborn Engineering argues that because the Complaint does not explain Kilborn Engineering's precise role in the preparation of these resource estimates, the allegations do not meet the particularity requirement of Rule 9 and

Court's approval, the Douglasses reserve the right to amend this complaint to add later allegations and/or causes of action based on information obtained through further discovery.

## XV.    EXHIBITS

248.    To the extent not expressly indicated, each of the respective exhibits to this Complaint are fully incorporated herein.  Please note that the Douglasses do not necessarily embrace the accuracy of the exhibits that were created by Defendants.  They may be inaccurate, and Plaintiffs reserve the right to challenge same through the course of discovery and this case.

## XVI.   DEMAND FOR JURY TRIAL

249.    The Douglasses respectfully demand a jury trial on all issues so triable.

## XVII.  PRAYER FOR RELIEF

250.    The Douglasses pray that the Court grant the following relief and judgment:

a.   That Plaintiffs be awarded actual damages that are adequate and sufficient to fully compensate for the Defendants' actions complained of herein;

b.   That Plaintiffs be awarded the remedy of rescission, at a minimum, and disgorgement of all fees and ill-gotten gains;

c.   That Plaintiffs be awarded other damages to the extent allowed by law;

---

the PSLRA. *Such information, however, is within the exclusive control of the Kilborn Defendants.*") (emphasis added).

d.  That Plaintiffs be awarded their costs and attorneys' fees to the extent allowed by law; and

e.  Such further and other relief as the Court and/or jury may deem proper and just.

DATED: September 4, 2012                    Respectfully submitted,

                                            */s/Travis Daxon Howard Richard*
                                            Bryan T. Forman
                                            State Bar No. 07258800
                                            bryan@formanlawfirm.com
                                            Forman Law Firm, P.C.
                                            117 E. Houston Street
                                            Tyler, Texas 75702
                                            T: 903.597.2221
                                            F: 903.597.2224

                                            Allen F. Gardner
                                            State Bar No. 24043679
                                            allengardner@potterminton.com
                                            **POTTER MINTON**
                                            A Professional Corporation
                                            110 N. College, Suite 500
                                            P. O. Box 359
                                            Tyler, Texas 75702
                                            903 597 8311
                                            903 593 0846 (Facsimile)

                                            Travis Daxon Howard Richard
                                            State Bar No. 24037356
                                            dax@tdrichardlaw.com
                                            The Law Offices of
                                            Travis Daxon Howard Richard
                                            6623 Del Norte Lane
                                            Dallas, TX 75225
                                            214.234.0500 (office)
                                            214.613.1007 (facsimile)

                                            **Attorneys for Plaintiffs**

{EXT/9086/0001/W0913138.5 }

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Fed. R. Civ. P. 5(b)(2)(E) on September 4, 2012.

*/s/Travis Daxon Howard Richard*
Travis Daxon Howard Richard